**Lansing, Michigan**

# Opinion

Chief Justice:    Justices:
Marilyn Kelly    Michael F. Cavanagh
   Elizabeth A. Weaver
   Maura D. Corrigan
   Robert P. Young, Jr.
   Stephen J. Markman
   Diane M. Hathaway

FILED JULY 31, 2010

S T A T E  O F  M I C H I G A N

SUPREME COURT

REGENTS OF THE UNIVERSITY OF
MICHIGAN and UNIVERSITY OF
MICHIGAN HEALTH SYSTEM,

       Plaintiffs-Appellants,

v                                No. 136905

TITAN INSURANCE COMPANY,

       Defendant-Appellee.

BEFORE THE ENTIRE BENCH

KELLY, C.J.

We examine whether MCL 600.5821(4), which preserves state entities' rights to

bring certain claims, also preserves the right to seek recovery of all damages incurred

notwithstanding the one-year-back rule of MCL 500.3145(1). We hold that MCL

600.5821(4) exempts the state entities it lists from the one-year-back rule. As a

consequence, we overrule *Liptow v State Farm Mut Ins Co*,[1] which held to the contrary, and reverse the judgment of the Court of Appeals. We also overrule *Cameron v Auto Club Ins Ass'n*,[2] on which the *Liptow* decision relied exclusively in reaching its conclusion.

FACTS AND PROCEDURAL HISTORY

Nicholas Morgan was severely injured in an automobile accident in March 2000. He was treated at the University of Michigan Health System for six days. Less than one year after the accident, Morgan sought personal protection insurance benefits through the Michigan Assigned Claims Facility (MACF). Because he was not covered under a no-fault insurance policy, the MACF designated Titan Insurance Company as the servicing insurer for his claims. In January 2006, the University of Michigan Health System and the university's regents filed this lawsuit against Titan, seeking payment from defendant for Morgan's medical treatment. Plaintiffs sought reimbursement of the full cost of Morgan's hospitalization, which they alleged was $69,957.19.

Defendant moved for summary disposition, arguing that the one-year-back rule of MCL 500.3145(1)[3] barred plaintiffs from recovering the claimed damages. Plaintiffs

---

[1] *Liptow v State Farm Mut Auto Ins Co*, 272 Mich App 544; 726 NW2d 442 (2006).

[2] *Cameron v Auto Club Ins Ass'n*, 476 Mich 55; 718 NW2d 784 (2006).

[3] The one-year-back rule in MCL 500.3145(1) provides that "the claimant may not recover benefits for any portion of the loss incurred more than 1 year before the date on which the action was commenced."

countered that MCL 600.5821(4)[4] allows the state and its political subdivisions to file suit without limitation and entirely supersedes MCL 500.3145(1). They asserted that MCL 600.5821(4) exempts certain suits brought by public entities from "the statute of limitations" and allows initiation of such actions "at any time without limitation, the provisions of any statute notwithstanding." The trial court agreed with defendant and dismissed the suit.

On appeal, the Court of Appeals affirmed in a divided decision.[5] The majority concluded that, under MCR 7.215(J)(1), it was bound to follow the *Liptow* decision and uphold the trial court. Judge DAVIS agreed that *Liptow* was controlling, but opined that it had been wrongly decided and that the Court should convene a conflict panel pursuant to MCR 7.215(J)(2) and (3). Initially, we denied leave to appeal,[6] but on reconsideration, we vacated the denial order, granted reconsideration, and granted leave to appeal.[7]

---

[4] MCL 600.5821(4) provides:

Actions brought in the name of the state of Michigan, the people of the state of Michigan, or any political subdivision of the state of Michigan, or in the name of any officer or otherwise for the benefit of the state of Michigan or any political subdivision of the state of Michigan for the recovery of the cost of maintenance, care, and treatment of persons in hospitals, homes, schools, and other state institutions are not subject to the statute of limitations and may be brought at any time without limitation, the provisions of any statute notwithstanding.

[5] *Univ of Mich Regents v Titan Ins Co*, unpublished opinion per curiam of the Court of Appeals, issued June 5, 2008 (Docket No. 276710).

[6] *Univ of Mich Regents v Titan Ins Co*, 482 Mich 1074 (2008).

[7] *Univ of Mich Regents v Titan Ins Co*, 484 Mich 852 (2009). Our order also directed the parties to address whether *Liptow* and *Cameron* were correctly decided.

3

MCL 600.5851(1)—THE MINORITY/INSANITY PROVISION

An analysis of this Court's rulings on the issues implicated in this case naturally begins with *Lambert v Calhoun*.[8]  *Lambert* held that MCL 600.5851(1)[9] preserves a claim by a minor or incompetent person even though the statute of limitations in the act under which the claim is brought bars the action.

Four years later, the Court of Appeals in *Rawlins v Aetna Cas & Surety Co* followed *Lambert*.[10]  It held that MCL 600.5851(1) preserves a no-fault claim by a minor even though it would otherwise be barred by the limitations period in the no-fault act.

Shortly after, in *Geiger v Detroit Auto Inter-Ins Exch*,[11] the Court of Appeals held that MCL 600.5851(1) preserves a claim by a minor or incompetent person for personal protection insurance benefits even though it would otherwise be barred by the one-year-back rule.  *Geiger* remained the prevailing law in this state for the next 24 years.

---

[8] *Lambert v Calhoun*, 394 Mich 179; 229 NW2d 332 (1975).

[9] MCL 600.5851(1) states in part:

> Except as otherwise provided in [MCL 600.5851(7) and (8)], if the person first entitled to make an entry or bring an action under this act is under 18 years of age or insane at the time the claim accrues, the person or those claiming under the person shall have 1 year after the disability is removed through death or otherwise, to make the entry or bring the action although the period of limitations has run.

[10] *Rawlins v Aetna Cas & Surety Co*, 92 Mich App 268; 284 NW2d 782 (1979).

[11] *Geiger v Detroit Auto Inter-Ins Exch*, 114 Mich App 283; 318 NW2d 833 (1982).

*CAMERON* AND *LIPTOW*

In 2006, in *Cameron*, this Court overruled *Geiger* in a 4 to 3 decision. The majority held that the minority/insanity provision in MCL 600.5851(1) did not remove the plaintiff's claim from application of the one-year-back rule. The analysis stated:

> By its unambiguous terms, MCL 600.5851(1) concerns when a minor or person suffering from insanity may "make the entry or bring the action." It does not pertain to the damages recoverable once an action has been brought. MCL 600.5851(1) then is irrelevant to the damages-limiting one-year-back provision of MCL 500.3145(1). Thus, to be clear, the minority/insanity tolling provision in MCL 600.5851(1) does not operate to toll the one-year-back rule of MCL 500.3145(1).[12]

Accordingly, the majority held that a statute governing when a party may bring an action does not affect the damages recoverable under the one-year-back rule.

In *Liptow*, the Court of Appeals examined the interplay of the one-year-back rule and MCL 600.5821(4). Relying solely on *Cameron*, it stated:

> Thus, the pertinent question is whether the damages-limiting portion of MCL 500.3145(1), the one-year-back rule, limits the [claimant's] recovery. This Court's ruling in *Univ of Michigan Regents* [*v State Farm Mut Ins Co*, 250 Mich App 719, 733; 650 NW2d 129 (2002)] is of no assistance in this determination. The issue appears to be one of first impression.
>
> MCL 600.5821(4) provides that actions brought by the state or its subdivisions to recover the cost of maintenance, care, and treatment of persons in state institutions "are not subject to the statute of limitations and may be brought at any time without limitation, the provisions of any statute notwithstanding." We conclude that, by the plain import of this language, the Legislature intended to exempt the state from statutes of limitations when bringing an action to recover public funds. The language refers to statutes of limitations and provides that an action may be brought at any

---

[12] *Cameron*, 476 Mich at 62.

time. But the statute does not address damage limitation provisions or any other limiting provisions. In other words, like the minority tolling provision, MCL 600.5821(4) concerns the *time* during which the state may bring an action; it "does not pertain to the damages recoverable once an action has been brought." *Cameron, supra*, 476 Mich at 62. Accordingly, we conclude that MCL 600.5821(4), like the minority tolling provision of MCL 600.5851(1), does not operate to toll the one-year-back rule of MCL 500.3145(1). *Cameron, supra*, 476 Mich at 61-62. Therefore, we hold that defendant is liable to the [claimant] only for costs it incurred for [the patient's] care, maintenance, and treatment in state institutions within one year before the filing of the complaint.[13]

## ANALYSIS

This case presents questions of statutory interpretation which are reviewed de novo.[14]

No party disputes that MCL 600.5821(4) preserves plaintiffs' right to bring the instant cause of action. The question before us is whether MCL 500.3145(1) restricts plaintiffs' recovery to damages incurred one year before plaintiffs filed suit. The answer turns on the correct understanding of the interaction between MCL 500.3145(1) and MCL 600.5821(4). It is undisputed that all of plaintiffs' costs were incurred between March 18 and March 23, 2000. Thus, if the one-year-back rule applies to their claim, plaintiffs are entitled to no damages.

Defendant relies on *Liptow*, which held that the one-year-back rule governs actions to which MCL 600.5821(4) applies because the statute does not exempt state entities from its limitation on damages. We disagree.

---

[13] *Liptow*, 272 Mich App at 555-556.

[14] *Dep't of Agriculture v Appletree Mktg, LLC*, 485 Mich 1, 7; 779 NW2d 237 (2010).

6

Defendant's argument and the holding in *Liptow* rest on a fundamentally incorrect premise. *Liptow* reasoned that (1) MCL 600.5821(4) exempts state entities from any statute of limitations, (2) the one-year-back rule of MCL 500.3145(1) is not a statute of limitations, but a damages limitation, and therefore (3) MCL 600.5821(4) does not exempt a governmental entity from the one-year-back-rule of MCL 500.3145(1).[15] This premise is derived from our decision in *Cameron*. Therefore, we are required to revisit *Cameron*'s analysis.

The *Cameron* majority concluded that actions brought pursuant to MCL 600.5851(1) are subject to the one-year-back rule because that statute does not implicate when a plaintiff may "bring an action." We conclude that the statutory language in MCL 600.5851(1) and MCL 500.3145(1) does not command the conclusion that the *Cameron* majority reached.

To begin with, we conclude that the approach in *Cameron* was flawed because it read the statutory language in isolation. MCL 600.5851(1) does not create its own independent cause of action. It must be read together with the statute under which the plaintiff seeks to recover. In no-fault cases, for example, MCL 600.5851(1) must be read together with MCL 500.3145(1). Doing so, the statutes grant infants and incompetent persons one year after their disability is removed to "bring the action" "for recovery of personal protection insurance benefits . . . for accidental bodily injury . . . ." On the basis

---

[15] See *Cameron*, 476 Mich at 62.

of its language, MCL 600.5851(1) supersedes all limitations in MCL 500.3145(1), including the one-year-back rule's limitation on the period of recovery.[16]

For what purpose might a plaintiff "bring an action"?  Surely not for the sole satisfaction of filing papers in court.  A plaintiff brings a tort action to recover damages.  Although the right to bring an action would be a hollow one indeed if a plaintiff could not recover damages, *Cameron* and *Liptow* limited a plaintiff to just that hollow right.  Therefore, we restore the proper understanding of the interaction between MCL 600.5851(1) and the one-year-back rule.  We hold that the "action" and "claim" preserved by MCL 600.5851(1) include the right to collect damages.  As Justice CAVANAGH explained in his dissenting opinion in *Cameron*,

> [t]he word "claim" has been discussed by this Court many times over the past century. For instance, in *Allen v Bd of State Auditors*, 122 Mich 324; 81 NW 113 (1899), this Court noted the following definition of the word "claim": "'[A] demand of a right or alleged right; a calling on another for something due or asserted to be due; as, a claim of wages for services.'" *Id.* at 328, citing *Cent Dict*.  In *In re Chamberlain's Estate*, 298 Mich 278; 299 NW 82 (1941), this Court explained that "'[t]he word "claims" is "by authorities generally construed as referring to demands of a pecuniary nature and which could have been enforced against the deceased in his lifetime."'" *Id.* at 285, quoting *In re Quinney's Estate*, 287 Mich 329, 333; 283 NW 599 (1939), quoting *Knutsen v Krook*, 111 Minn 352, 357; 127 NW 11 (1910).  More recently, in *CAM Constr v Lake Edgewood Condo Ass'n*, 465 Mich 549, 554-555; 640 NW2d 256 (2002), this Court set forth the legal definitions of the term:
>
>> "1. The aggregate of operative facts giving rise to a right enforceable by a court . . . .  2. The assertion of an existing right; any right to payment

---

[16] Therefore, we also do not agree with Justice MARKMAN's criticism that we "discern the purpose of the statute from something other than its actual language . . . ." *Post* at ___.

8

or to an equitable remedy, even if contingent or provisional . . . . 3. A demand for money or property to which one asserts a right . . . . [Black's Law Dictionary (7th ed).]"

In short, then, a claim means a "demand[] of a pecuniary nature," a "right to payment," and a "demand for money."[17]

Justice CAVANAGH's dissent is equally applicable here. The statute at issue in this case, MCL 600.5821(4), also addresses "[a]ctions." Specifically, it preserves actions brought by state entities. It also explicitly delineates that the action contemplated is one brought for the recovery for certain costs incurred. MCL 600.5821(4) lists the costs as those for the "maintenance, care, and treatment of persons in hospitals, homes, schools, and other state institutions . . . ." Thus, it is apparent from the language of the statute that the Legislature intended to preserve more than the state entities' right to file papers in court.

Moreover, this Court's caselaw predating *Cameron* also does not support the *Cameron* majority's holding. The only authority cited for *Cameron*'s interpretation was in Justice MARKMAN's concurring opinion, which relied on dicta from Justice BRICKLEY's lead opinion in *Howard v Gen Motors Corp*.[18]

---

[17] *Cameron*, 476 Mich at 100 (CAVANAGH, J., dissenting).

[18] *Howard v Gen Motors Corp*, 427 Mich 358; 399 NW2d 10 (1986). Only Justice RILEY concurred in Justice BRICKLEY's opinion.

We take no issue with Justice MARKMAN's argument that the *Cameron* majority needed no "authority" to support its holding other than "the language of the statute itself." *Post* at ___. But he wrongly claims that this opinion "fails to apprehend" the principle of statutory interpretation that the actual language of the statutes is the best indicator of legislative intent. *Post* at ___. To the contrary, we conclude that the

9

In *Howard*, two justices analyzed the one-year-back rule in the workers' compensation act to determine whether it was a jurisdictional affirmative defense akin to a statute of limitations. Justice BRICKLEY concluded that "the 'statute of limitations' interpretation of the one-year-back rule offered in *Kleinschrodt*[19] and applied to the two-year-back rule in *Kingery*[20] and *Howard* [in the Court of Appeals] contradicts our earlier precedent on the subject as well as the plain language of the statutes."[21] By contrast, in *Kleinschrodt*, five justices stated that "[w]e are of the opinion that the one-year-back provision is a defense, akin to the statute of limitations . . . ."[22]

In sum, for more than 20 years before *Cameron*, the majority in all of the Court's relevant opinions saw no basis for treating any of the provisions of MCL 500.3145(1) differently. In *Welton v Carriers Ins Co*, we made a distinction among the provisions only to the extent of noting that the section contains "two limitations on time of suit and one limitation on period of recovery[.]"[23] Even then, the *Welton* Court saw no basis for

---

statutory language does not compel the interpretation reached by the *Cameron* majority. See pages 7-10 of this opinion. We make the additional observation that our caselaw also provides no support for the *Cameron* majority's interpretation.

[19] *Kleinschrodt v Gen Motors Corp*, 402 Mich 381, 384; 263 NW2d 246 (1978).

[20] *Kingery v Ford Motor Co*, 116 Mich App 606; 323 NW2d 318 (1982).

[21] *Howard*, 427 Mich at 383.

[22] *Kleinschrodt*, 402 Mich at 384.

[23] *Welton v Carriers Ins Co*, 421 Mich 571, 576; 365 NW2d 170 (1984).

treating the provisions differently.[24]  Indeed, the law was so well settled that the defendants in *Cameron* did not even argue for different treatment until this Court heard oral argument on appeal.[25]

Thus, we conclude that *Cameron* erroneously held that MCL 600.5851(1) does not protect a plaintiff's claim from the one-year-back rule.  We also hold that this understanding of the interaction between the statutes is equally applicable to the interaction between MCL 600.5821(4) and MCL 500.3145(1).  Therefore, the provisions of MCL 600.5821(4) preserving a plaintiff's right to bring an action also preserve the plaintiff's right to recover damages incurred more than one year before suit is filed.  The one-year-back rule in MCL 500.3145(1) is inapplicable to such claims.[26]

---

[24] *Id.* at 577 n 2 ("Applying the tolling to both the limitation period and the period of recovery accords with common sense, since the only reason for tolling the limitation provision to get plaintiff into court is to allow recovery for that earlier expense.").

[25] *Cameron*, 476 Mich at 89 n 4 (CAVANAGH, J., dissenting).  As Justice CAVANAGH observed, defense counsel in *Cameron* did not even divine this argument, but adopted it only after this Court raised the question sua sponte.

[26] In reaching our decision today, we do not rely on plaintiffs' argument that *Liptow* was inconsistent with the Court of Appeals' decision in *Univ of Mich Regents v State Farm Mut Ins Co*, 250 Mich App 719; 650 NW2d 129 (2002).  Thus, we need not address Justice MARKMAN's rejection of this argument.

We also decline to comment on Justice MARKMAN's discussion of the "absurd result" doctrine, because we do not rely on it to reach our decision here.

## STARE DECISIS[27]

For the aforementioned reasons, we conclude that *Cameron* was wrongly decided. However, despite the fact that a previous decision was wrongly decided, we must be mindful of the doctrine of stare decisis when deciding whether to overrule it.[28] Our analysis always begins with a presumption that upholding precedent is the preferred

---

[27] I recognize that there are different approaches used by members of the Court in applying the doctrine of stare decisis. See, e.g., *post* at __ (WEAVER, J., concurring); *post* at __ (HATHAWAY, J., concurring); *Robinson v Detroit*, 462 Mich 439, 464; 613 NW2d 307 (2000).

I believe that our thoughtful and lengthy treatments of whether *Cameron* is entitled to stare decisis respect belie Justice YOUNG's criticism that "today precedent is no longer an 'issue.'" *Post* at ___. Justice YOUNG disdains our positions of the last decade regarding stare decisis as nothing but a "decade-long shrill pretense . . . ." *Post* at ___. But he is incorrect. Not only have our positions been put forth without vitriol and ad hominem innuendos, there has been no pretense about them.

Nor do we simply ignore precedent with which we disagree, as Justice YOUNG once again asserts. It appears that he intends to repeat himself using an identical attack in each and every case in which I vote for a different result than he does. See, e.g., *Esselman v Garden City Hosp*, 486 Mich 892 (2010). But with each repetition, his claims grow less believable.

Finally, Justice YOUNG again quotes a statement I made two years ago and applies it in an altogether different context to impugn my motives for voting as I have in this case. But he has no wisdom concerning my motives, nor do I claim any concerning his. His attack has no proper place in a judicial opinion.

[28] We are at a loss to understand Justice MARKMAN's argument that we deem it "appropriate" to overrule *Cameron* because *Cameron* overruled *Geiger*. *Post* at ___, ___. To be clear, we conclude that it is appropriate to overrule *Cameron* because it was wrongly decided and stare decisis considerations do not support retaining it. Thus, weighing the merits of overruling *Cameron* vis-à-vis overruling *Geiger*, an analysis that his dissent engages in, *post* at ___, is not necessary to our analysis. He also claims that our decision to overrule *Cameron* makes the caselaw of our state less consistent with the intentions of the Legislature. *Post* at ___. In most disputes that come before this Court, including this one, the validity of such a claim is undoubtedly in the eye of the beholder.

course of action.[29] That presumption should be retained until effectively rebutted by the conclusion that a compelling justification exists to overturn it.[30] Nonetheless, when analyzing precedent that itself represents a recent departure from established caselaw, we apply a decreased presumption in favor of upholding precedent.[31]

In determining whether a compelling justification exists to overturn precedent, the Court may consider numerous evaluative criteria, none of which, standing alone, is dispositive. Historically, courts have considered (1) whether the precedent has proved to be intolerable because it defies practical workability, (2) whether reliance on it is such that overruling it would cause a special hardship and inequity, (3) whether related principles of law have so far developed since the precedent was pronounced that no more than a remnant of it has survived, (4) whether facts and circumstances have so changed, or come to be seen so differently, as to have robbed the precedent of significant application or justification, (5) whether other jurisdictions have decided similar issues in a different manner, (6) whether upholding the precedent is likely to result in serious detriment prejudicial to public interests, and (7) whether the prior decision was an abrupt and largely unexplained departure from then existing precedent.

---

[29] *Petersen v Magna Corp*, 484 Mich 300, 317; 773 NW2d 564 (2009) (opinion by KELLY, C.J.).

[30] *Id.*

[31] *Adarand Constructors, Inc v Pena*, 515 US 200, 233-234; 115 S Ct 2097; 132 L Ed 2d 158 (1995).

These factors may or may not be applicable in a given case. Nor is there a magic number of factors that must favor overruling a case in order to establish the requisite compelling justification. Rather, this conclusion should be reached on a case-by-case basis.

Here, we first consider whether *Cameron* has proved intolerable because it defies practical workability. Indeed it does. *Cameron* left MCL 600.5851(1) and similar provisions void of effect in many cases while ostensibly protecting an injured party's right to file suit. This created an indefensible paradox and, as such, an unworkable and confusing legal landscape. Consider, for example, the hypothetical case of a boy injured in a car accident at age 12 and fully recovered by age 15. Upon reaching 18, he retains an attorney to file suit to recover the costs associated with the treatment of his injuries, relying on MCL 600.5851(1). The defendant also retains counsel, who responds by filing a motion to dismiss, arguing that none of the plaintiff's damages are recoverable. The trial court parses the parties' filings and determines that none of the plaintiff's costs were incurred in the year before suit was filed.

Under *Cameron*, the plaintiff in this hypothetical case was indisputably entitled to file suit, because MCL 600.5851(1) preserved his right to do so. Yet *Cameron* gutted his suit of any practical worth because, under its interpretation of MCL 600.5851(1), the plaintiff had no chance to recover any damages. Thus, the plaintiff was denied the legal recourse the Legislature provided him, which is, after reaching his majority, to recover the damages he incurred more than a year earlier. Accordingly, we conclude that *Cameron* is frequently innately unworkable.

14

Second, we consider whether reliance interests weigh in favor of overruling *Cameron*. We conclude that they do. *Cameron* is of recent vintage, having been decided a mere four years ago. Hence, reliance on its holding has been of limited duration. Moreover, *Cameron* represented a sea change in one area of the law and toppled settled interpretations of the no-fault act that had existed almost since the adoption of MCL 600.5851.[32] In doing so, *Cameron* disrupted the reliance interests of the injured minors and the incompetents who relied on its provisions to preserve their claims until removal of their disabilities.

We recognize that there exists a competing reliance interest in the continuing validity of *Cameron*: that of the defendants in no-fault cases. Yet *Cameron*'s evisceration of the crux of a plaintiff's claim—the potential to recover damages— effectively removed altogether the incentive to file suit as permitted by MCL 600.5851(1). We conclude that, while no-fault defendants' reliance on this interpretation is reasonable, it is not itself sufficient to preclude overruling *Cameron* given the extent of *Cameron*'s prejudice to no-fault plaintiffs.

Third, we consider whether related principles of law have developed since *Cameron*'s interpretation of MCL 600.5851(1) was pronounced. This factor is inapplicable to our stare decisis analysis in this case, as we are aware of no intervening change in the law that further supports or undermines *Cameron*'s continuing legitimacy.

---

[32] See n 35 of this opinion.

Fourth, we examine whether facts and circumstances have so changed, or have come to be seen so differently, that *Cameron* has been robbed of significant justification. Like the previous factor, we discern no factual or circumstantial changes that counsel for or against overruling *Cameron*. Therefore, this factor also is inapplicable to our analysis.

Fifth, we consider whether other jurisdictions have decided similar issues in a different manner. This factor is likewise inapplicable to our stare decisis analysis. Michigan's comprehensive no-fault insurance scheme is unique to our state. While other states share the fundamental underpinnings of our system, judicial interpretations of the no-fault act have evolved independently of those of other states with similar insurance schemes. Thus, other jurisdictions' interpretations of similar statutes are unhelpful to our analysis in this case.

Sixth, we examine whether upholding *Cameron* is likely to result in serious detriment prejudicial to public interests. We conclude that this factor weighs heavily in favor of overruling *Cameron*. *Cameron* drastically curtailed the protection provided by the Legislature for minors and incompetents. In enacting MCL 600.5851(1), the Legislature conveyed its intention to protect individuals in those groups with unique treatment under the law. The statute represents the culmination of the Legislature's deliberative process. *Cameron* undermined the Legislature's decision to provide a "year of grace" to infants and incompetents in recognition of their inability to legally act until their disabilities are removed.[33]

---

[33] See *Cameron*, 476 Mich at 97 (CAVANAGH, J., dissenting).

Moreover, *Cameron* set an ironic trap for minors and incompetents. As Justice CAVANAGH astutely noted in dissent:

> [I]f a person is injured in a motor vehicle accident while an infant or legally incompetent, and his injuries resolve a year or more before his disability resolves, then [*Cameron*'s] interpretation of MCL 500.3145(1) will completely preclude that person from recovering *any* of the damages incurred from the accident, and, thus completely abrogate his claim.[34]

Thus, what the Legislature intended as a provision to preserve a plaintiff's claims, *Cameron* rendered largely meaningless. In certain circumstances, *Cameron*'s interpretation of the saving provision actually operates to extinguish a claim, not save it.

Finally, we consider whether *Cameron* represented an abrupt and largely unexplained departure from precedent. We conclude that this factor also weighs heavily in favor of overruling *Cameron*. *Cameron* overruled *Geiger*,[35] a Court of Appeals case interpreting the interplay between the saving provision and the no-fault act. *Geiger* was

---

Moreover, Justice MARKMAN is certainly correct that there is a general public interest in keeping no-fault insurance affordable. However, preserving claims brought by a group specifically protected by the Legislature—minors, incompetents, or state entities—is particularly compelling, given that the Legislature singled out these groups for disparate treatment.

[34] *Id*. at 93 n 6.

[35] *Geiger* cited *Rawlins* for the proposition that MCL 600.5851 applied to the one-year period of limitations in MCL 500.3145(1). Thus, the underlying analytical support for *Geiger* dates back 27 years.

17

decided in 1982 and stood as the seminal interpretation of the one-year-back rule until *Cameron* unexpectedly swept it aside 24 years later.[36]

Furthermore, as noted, a majority of this Court had concluded before *Cameron* that the one-year-back rule does not apply to claims preserved by tolling. We made this decision even though in *Welton* we described the provisions of MCL 500.3145(1) as "two limitations on time of suit and one limitation on period of recovery[.]"[37] To the extent that *Cameron* held otherwise, it also implicitly overruled *Welton*. Thus, we are firmly convinced that *Cameron* represented an abrupt and largely unexplained departure from precedent.

In summary, *Cameron* is often unworkable, has not engendered valid reliance interests, has caused serious detriment prejudicial to public interests, and represented an abrupt and largely unexplained departure from precedent. Accordingly, we conclude that a compelling justification exists for overruling it.[38]

---

[36] Given that our decision does nothing more than restore the law to its pre-2006 state, we find defendant's assertion that overruling *Cameron* will have "devastating effects" highly questionable.

[37] *Welton*, 421 Mich at 576.

[38] Justice MARKMAN is correct that a majority of this Court has overruled several precedents this term. But it is an overstatement for his dissent to characterize this as a mass or flood of overrulings. *Post* at ___. This is particularly true given that almost every case overruled this term is one in which the former majority departed from settled jurisprudence to establish a new rule of law.

CONCLUSION

We overrule our decision in *Cameron* and the Court of Appeals' decision in *Liptow*. Entities listed in MCL 600.5821(4) may bring an action and recover costs notwithstanding the limiting provisions of MCL 500.3145(1), including the one-year-back rule. Therefore, we reverse the judgment of the Court of Appeals in this case and remand the case to the circuit court for further proceedings consistent with this opinion.

CAVANAGH, WEAVER (except for the part entitled "Stare Decisis"), and HATHAWAY, JJ., concurred with KELLY, C.J.

STATE OF MICHIGAN

SUPREME COURT

REGENTS OF THE UNIVERSITY OF
MICHIGAN and UNIVERSITY OF
MICHIGAN HEALTH SYSTEM,

        Plaintiffs-Appellants,

v                                No. 136905

TITAN INSURANCE COMPANY,

        Defendant-Appellee.

_____

WEAVER, J. (*concurring*).

I concur in and sign all of the majority opinion except the section entitled "Stare Decisis." I write separately to note that in addition to the reasons given in the majority opinion, I also believe that *Cameron v Auto Club Ins Ass'n*, 476 Mich 55; 718 NW2d 784 (2006), should be overruled for the reasons in my dissent to the *Cameron* decision. *Id*. at 104.

In *Cameron*, the majority failed to give proper effect to the language contained in MCL 500.3145(1).[1] As I noted in my *Cameron* dissent, the "one-year-back rule" is not a

_____

[1] MCL 500.3145(1) states:

      An action for recovery of personal protection insurance benefits payable under this chapter for accidental bodily injury may not be commenced later than 1 year after the date of the accident causing the injury unless written notice of injury as provided herein has been given to the insurer within 1 year after the accident or unless the insurer has

period of limitations as interpreted by the majority. *Id*. at 106. Rather, the "one-year-back rule" is part of the statute that details how to apply the tolling provision contained in the period of limitations laid out in the first sentence of MCL 500.3145(1). *Id*. at 106-107. By holding that the one-year-back rule was a period of limitations, the *Cameron* majority failed to "give meaning to the actual text of the statute." *Id*. at 108.

In addition to the lack of restraint of the *Cameron* majority's use of the judicial power of interpretation, Chief Justice KELLY's majority opinion in this case shows that the *Cameron* majority failed to exercise common sense and fairness. As noted in Chief Justice KELLY's majority opinion in this case, *Cameron* resulted in the Legislature's savings provisions regarding minors and government entities becoming hollow rights when injuries occurred more than a year before a lawsuit was filed.

On the subject of stare decisis, Justice YOUNG's dissent in this case attempts to deceive the public. It attempts to lump together the four justices who agree with parts of the majority opinion into having had some sort of previously stated fidelity to stare decisis that those justices have abandoned since former Chief Justice TAYLOR's overwhelming defeat in the 2008 election.

---

previously made a payment of personal protection insurance benefits for the injury. If the notice has been given or a payment has been made, the action may be commenced at any time within 1 year after the most recent allowable expense, work loss or survivor's loss has been incurred. However, the claimant may not recover benefits for any portion of the loss incurred more than 1 year before the date on which the action was commenced.

2

Justice YOUNG's dissent quotes various past statements, made by those justices signing portions of the majority opinion, regarding stare decisis and criticizing the former "majority of four" (former Chief Justice TAYLOR and Justices CORRIGAN, YOUNG, and MARKMAN). With respect to myself, the dissent quotes a statement I made in response to the improper and unfair dismantling of decades of longstanding insurance contract law by the former "majority of four" in *Devillers v Auto Club Ins Ass'n*, 473 Mich 562; 702 NW2d 539 (2005). In *Devillers*, I stated, "Correction for correction's sake does not make sense. The case has not been made why the Court should not adhere to the doctrine of stare decisis *in this case*." *Id*. at 622 (WEAVER, J., dissenting) (emphasis added).

Justice YOUNG's dissent uses my *Devillers* statement in what appears to be an attempt to try to get people to believe that I have somehow changed my view of stare decisis since former Chief Justice TAYLOR was defeated. The dissent's misleading assertions are simply incorrect.

My *Devillers* statement itself shows that I was criticizing the disregard for stare decisis in that *specific case*. My *Devillers* statement is an example of my service to the rule of law and a partial expression of my view of the policy of stare decisis, which is that past precedent should generally be followed but that, in deciding whether wrongly decided precedent should be overruled, each case should be looked at individually on its facts and merits through the lens of judicial restraint, common sense, and fairness.

Justice YOUNG's dissent cannot point to a statement where I professed some sort of position regarding stare decisis as an immutable doctrine because I have not taken that position and therefore have made no such statements. Justice YOUNG's various dissents

3

continue to mischaracterize my positions by making inaccurate statements, using partial quotes taken out of context, and omitting relevant information in an apparent attempt to deceive readers.[2]

I agree with the sentiment recently expressed by Chief Justice Roberts of the United States Supreme Court in his concurrence to the decision in *Citizens United v Fed Election Comm*, 558 US ___, ___; 130 S Ct 876, 920; 175 L Ed 2d 753, 806 (2010), when he said that

> *stare decisis* is neither an "inexorable command," *Lawrence* v. *Texas*, 539 U. S. 558, 577 [123 S Ct 2472; 156 L Ed 2d 508] (2003), nor "a mechanical formula of adherence to the latest decision," *Helvering* v. *Hallock*, 309 U. S. 106, 119 [60 S Ct 444; 84 L Ed 604] (1940) . . . . If it were, segregation would be legal, minimum wage laws would be unconstitutional, and the Government could wiretap ordinary criminal suspects without first obtaining warrants. See *Plessy* v. *Ferguson*, 163 U. S. 537 [16 S Ct 1138; 41 L Ed 256] (1896), overruled by *Brown* v. *Board of Education*, 347 U. S. 483 [74 S Ct 686; 98 L Ed 873] (1954); *Adkins* v. *Children's Hospital of D. C.*, 261 U. S. 525 [43 S Ct 394; 67 L Ed 785] (1923), overruled by *West Coast Hotel Co* v. *Parrish*, 300 U. S. 379 [57 S Ct 578; 81 L Ed 703] (1937); *Olmstead* v. *United States*, 277 U. S. 438 [48 S Ct 564; 72 L Ed 944] (1928), overruled by *Katz* v. *United States*, 389 U. S. 347 [88 S Ct 507; 19 L Ed 2d 576] (1967).

Chief Justice Roberts further called stare decisis a "principle of policy" and said that it "is not an end in itself." *Id*. at ___; 130 S Ct at 920; 175 L Ed 2d at 807. He explained that "[i]ts greatest purpose is to serve a constitutional ideal—the rule of law. It follows that in the unusual circumstance when fidelity to any particular precedent does more to damage

---

[2] I will leave it to the people of Michigan to judge and determine my commitment to the rule of law, judicial restraint, common sense, fairness, and independence.

this constitutional ideal than to advance it, we must be more willing to depart from that precedent." *Id* at ___; 130 S Ct at 921; 175 L Ed 2d at 807.[3]

I agree with Chief Justice Roberts that stare decisis is a policy and not an immutable doctrine. I chose not to sign Chief Justice KELLY's lead opinion in *Petersen v Magna Corp*, 484 Mich 300, 316-320; 773 NW2d 564 (2009), because it proposed to create a standardized test for stare decisis. Likewise, I do not sign the majority opinion's stare decisis section in this case because it applies *Petersen*. There is no need for this Court to adopt any standardized test regarding stare decisis. In fact, it is an impossible

---

[3] It appears that Justice YOUNG does not agree with Chief Justice Roberts. In Justice YOUNG's dissent, he lists 12 cases that have been overruled by this Court in the past 18 months. While Justice YOUNG may feel aggrieved by this Court overruling those 12 cases, amongst those cases were some of the most egregious examples of judicial activism that did great harm to the people of Michigan. Those decisions were made by the "majority of four," including Justice YOUNG, under the guise of ideologies such as "textualism" and "judicial traditionalism." Justice YOUNG's apparent contempt for the common law and common sense can be seen in his 2004 article in the Texas Review of Law and Politics, where Justice YOUNG stated:

> Consequently, I want to focus my remarks here on the embarrassment that the common law presents—or ought to present—to a conscientious judicial traditionalist. . . .

> To give a graphic illustration of my feelings on the subject, I tend to think of the common law as a drunken, toothless ancient relative, sprawled prominently and in a state of nature on a settee in the middle of one's genteel garden party. Grandpa's presence is undoubtedly a cause of mortification to the host. But since only the most ill-bred of guests would be coarse enough to comment on Grandpa's presence and condition, all concerned simply try ignore him. [Young, *A judicial traditionalist confronts the common law*, 8 Texas Rev L & Pol 299, 301-302 (2004).]

task. There are many factors to consider when deciding whether or not to overrule precedent, and the importance of such factors often changes on a case-by-case basis.[4]

In the end, the consideration of stare decisis and whether to overrule wrongly decided precedent always includes service to the rule of law through an application and exercise of judicial restraint, common sense, and a sense of fairness—justice for all.

In serving the rule of law and applying judicial restraint, common sense, and a sense of fairness to the case at hand, I agree with and join the majority opinion's holding that *Cameron* is overruled.

Elizabeth A. Weaver

---

[4] Over the past decade, the principal tool used by this Court to decide when a precedent should be overruled is the set of guidelines that was laid out in *Robinson v Detroit*, 462 Mich 439, 463; 613 NW2d 307 (2000), an opinion written by former Justice TAYLOR that Justices CORRIGAN, YOUNG, MARKMAN, and I signed, and that I have used numerous times. By no means do I consider the *Robinson* guidelines a "be-all, end-all test" that constitutes precedent of this Court to be used whenever this Court considers overruling precedent. I view *Robinson* as merely providing guidelines to assist this Court in its legal analysis when pertinent. I note that my position in *Devillers* is in no way inconsistent with my position on stare decisis in this case, nor is it inconsistent with any position on stare decisis that I have taken in other cases, such as *Robinson*. *Devillers* involved the "majority of four" overruling precedent involving contract interpretation from a case that was nearly twenty (20) years old. In my *Devillers* dissent, I noted that I agreed with the majority's interpretation that the old precedent was incorrect, but given the passage of time since that specific precedent was decided, the Court should not disturb that longstanding precedent because the law had become so ingrained that to overrule it would harm the reliance interests of parties in insurance cases. My position in *Devillers* was entirely consistent with the reliance prong of the *Robinson* guidelines. My position in the instant case is also consistent with the reliance prong of the *Robinson* guidelines since *Cameron*, the case which is now being overruled, was only decided four (4) years ago.

S T A T E   O F   M I C H I G A N

SUPREME COURT

REGENTS OF THE UNIVERSITY OF
MICHIGAN and UNIVERSITY OF
MICHIGAN HEALTH SYSTEM,

       Plaintiffs-Appellants,

v

       No. 136905

TITAN INSURANCE COMPANY,

       Defendant-Appellee.

_____

HATHAWAY, J. (*concurring*).

I fully concur with Chief Justice KELLY's analysis and conclusion in this matter and support overruling *Cameron v Auto Club Ins Ass'n*, 476 Mich 55; 718 NW2d 784 (2006). I also fully concur with Justice WEAVER's stare decisis analysis in her concurring opinion. I write separately to express my own thoughts on the doctrine of stare decisis.

Given the debate amongst the justices of this Court concerning what constitutes the proper stare decisis analysis, I find it insightful to review how our United States Supreme Court has treated the doctrine. Stare decisis is a principle of policy that commands judicial respect for a court's earlier decisions and the rules of law that they embody. See *Harris v United States*, 536 US 545, 556-557; 122 S Ct 2406; 153 L Ed 2d 524 (2002); *Helvering v Hallock*, 309 US 106, 119; 60 S Ct 444; 84 L Ed 604 (1940). "*Stare decisis* is the preferred course because it promotes the evenhanded, predictable,

and consistent development of legal principles, fosters reliance on judicial decisions, and contributes to the actual and perceived integrity of the judicial process." *Payne v Tennessee*, 501 US 808, 827; 111 S Ct 2597; 115 L Ed 2d 720 (1991). However, when balancing the need to depart from precedent with the need to adhere to established precedent, it is important to bear in mind that stare decisis is neither an "inexorable command," *Lawrence v Texas*, 539 US 558, 577; 123 S Ct 2472; 156 L Ed 2d 508 (2003), nor "a mechanical formula of adherence to the latest decision," *Helvering*, 309 US at 119. "If it were, *segregation would be legal, minimum wage laws would be unconstitutional, and the Government could wiretap ordinary criminal suspects without first obtaining warrants.* See *Plessy* v. *Ferguson*, 163 U. S. 537 [16 S Ct 1138; 41 L Ed 256] (1896), overruled by *Brown* v. *Board of Education*, 347 U. S. 483 [74 S Ct 686; 98 L Ed 873] (1954); *Adkins* v. *Children's Hospital of D. C.*, 261 U. S. 525 [43 S Ct 394; 67 L Ed 785] (1923), overruled by *West Coast Hotel Co.* v. *Parish*, 300 U. S. 379 [57 S Ct 578; 81 L Ed 703] (1937); *Olmstead* v. *United States*, 277 U. S. 438 [48 S Ct 564; 72 L Ed 944] (1928), overruled by *Katz* v. *United States*, 389 U. S. 347 [88 S Ct 507; 19 L Ed 2d 576] (1967)." *Citizens United v Fed Election Comm*, 558 US __, __; 130 S Ct 876, 920; 175 L Ed 2d 753, 806 (2010) (Roberts, C.J., concurring).

I too believe that stare decisis is a principle of policy. As stated in *Helvering*:

> We recognize that *stare decisis* embodies an important social policy. It represents an element of continuity in law, and is rooted in the psychologic need to satisfy reasonable expectations. But *stare decisis* is a principle of policy and not a mechanical formula of adherence to the latest decision, however recent and questionable, when such adherence involves

2

collision with a prior doctrine more embracing in its scope, intrinsically sounder, and verified by experience.[1]

I do not agree with any approach to stare decisis that suggests or implies that it is a "rule" or "law" subject to a particularized test to be used in all circumstances. Any particular approach to stare decisis, such as the one taken in *Robinson v Detroit*, 462 Mich 439; 613 NW2d 307 (2000), is not "law" or "established precedent" that would require us to overrule, reject or modify its analysis. The *Robinson* approach to stare decisis, just as the one taken in *Petersen v Magna Corp*, 484 Mich 300; 773 NW2d 564 (2009), is one among many varying approaches, and no particular approach, in and of itself, is inherently superior to another. As with any policy determination, the approach taken in any given case will depend on the facts and circumstances presented.

Historically, the United States Supreme Court has utilized many different approaches to stare decisis, including such approaches as those involving a "compelling justification,"[2] "special justification,"[3] and a determination that a case was "wrongly decided."[4] Each of these approaches is valid and offers a different nuance to stare decisis

---

[1] *Helvering*, 309 US at 119.

[2] *14 Penn Plaza LLC v Pyett*, 556 US ___, ___; 129 S Ct 1456, 1478; 173 L Ed 2d 398, 425 (2009).

[3] *Arizona v Rumsey*, 467 US 203, 212; 104 S Ct 2305; 81 L Ed 2d 164 (1984).

[4] *Seminole Tribe of Florida v Florida*, 517 US 44, 66; 116 S Ct 1114; 134 L Ed 2d 252 (1996).

consideration.[5] However, because stare decisis is a policy consideration, which must be considered on a case-by-case basis, the particular analytical approach will differ from case to case. Most importantly, the critical analysis should be on the rationale regarding whether or not to change precedent.

It is also worthy to note that not only has the United States Supreme Court historically not taken one single approach to the application of stare decisis, the Court has not felt compelled to discuss stare decisis in all cases when precedent is being overturned. Many landmark cases that overruled well-established precedent did not discuss or even mention the phrase "stare decisis." For example, *Brown* overruled *Plessy*, thereby ending segregation in our public schools, without mentioning the phrase "stare decisis," much less articulating and following a particularized test. Similarly, *Gideon v Wainwright*, 372 US 335; 83 S Ct 792; 9 L Ed 2d 799 (1963), which established the rights of indigents to have counsel in all criminal cases, not merely capital offenses, overruled *Betts v Brady*, 316 US 455; 62 S Ct 1252; 86 L Ed 1595 (1942), again without mentioning "stare decisis" or a particularized test. Instead, both of these cases focused on the important policy considerations that weighed in favor of overruling precedent.[6]

---

[5] Any of these approaches to stare decisis can be valid depending on the issues before the court. However, the factors used in any of these tests may or may not be applicable in any given case.

[6] See Supreme Court Decisions Overruled By Subsequent Decisions, available at <http://www.gpoaccess.gov/constitution/pdf2002/048.pdf> (accessed July 28, 2010), for a partial list of United States Supreme Court cases (covering the period from 1810 to 2001) that overrule precedent. Numerous additional examples can be found on this list of

With these principles in mind, any analysis of the impact of stare decisis must focus on the individual case and the reason for overruling precedent. Thus, the reasons for overruling *Cameron* are paramount to any articulated test and the special and compelling justifications to do so are overwhelming in this case. As I agree with the well-articulated reasons expressed by Chief Justice KELLY, I will not repeat them here.

Diane M. Hathaway

---

cases that do not mention or discuss the phrase "stare decisis" despite the fact that the case overrules precedent.

5

STATE OF MICHIGAN

SUPREME COURT

REGENTS OF THE UNIVERSITY OF
MICHIGAN and UNIVERSITY OF
MICHIGAN HEALTH SYSTEM,

      Plaintiffs-Appellants,

v                                  No. 136905

TITAN INSURANCE COMPANY,

      Defendant-Appellee.

---

KELLY, C.J. (*concurring*).

I authored the majority opinion in this case and therefore join it in its entirety. I write separately because Justices YOUNG and CORRIGAN continue to misleadingly refer to a statement I made off the bench nearly two years ago that was published by the *Detroit Free Press*.[1] They seem to believe that this statement provides them insight into my motivation for voting as I have in every subsequent case that has come before the

---

[1] *Post* at ___. Justice YOUNG has cited my statement on numerous occasions, impugning my motives for voting as I did on each occasion. See, e.g., *O'Neal v St John Hosp & Med Ctr*, ___ Mich ___, ___; ___ NW2d ___ (2010) (YOUNG, J., dissenting); *Pollard v Suburban Mobility Auth for Regional Transp*, 486 Mich 963, 965 (2010) (YOUNG, J., dissenting); *Idalski v Schwedt*, 486 Mich 916, 918 (2010) (YOUNG, J., dissenting); *People v Feezel*, 486 Mich 184, 221 n 13; 783 NW2d 67 (2010) (YOUNG, J., dissenting); *Lansing Sch Ed Ass'n v Lansing Bd of Ed*, 485 Mich 966 (2009) (YOUNG, J., dissenting); *Hoover v Mich Mut Ins Co*, 485 Mich 881, 882 (2009) (YOUNG, J., dissenting); *Lenawee Co Bd of Rd Comm'rs v State Auto Prop & Cas Ins Co*, 485 Mich 853, 856 (2009) (YOUNG, J., dissenting).

Court. They are manifestly incorrect. To be clear, my remark reflected my desire to "undo . . . the damage" done to the good reputation of this Court as an institution during the former majority's tenure.[2] My only "agenda" was and is to restore nationwide respect to this Court and to chart a new course of civility.[3] Of course, I do not control Justice YOUNG's pen. His dissenting opinion demonstrates that my efforts in the area of civility have not yet been as successful as I hoped.

Written opinions serve an important function in the judicial process: they provide a forum in which the majority and dissenting justices debate the legal issues raised in cases. Sometimes that debate focuses on a narrow question. Other times, the debate

---

[2] See Liptak, *Unfettered Debate Takes Unflattering Turn in Michigan Supreme Court*, NY Times, January 19, 2007, available at <http://www.nytimes.com/2007/01/19/us/19michigan.html?_r=1> (accessed July 28, 2010).

[3] I do not find it "disquieting" that Justice YOUNG quotes my remark. Rather, I find it disquieting that Justices YOUNG and CORRIGAN conclude in a legal opinion that the remark was made with a "dreadful," "disquieting," and "scurrilous" intent.

In regard to the quoted portion of my statement referring to my pledge to not sleep on the bench, Justice YOUNG does not tell the whole story. The day after I was elected Chief Justice, I was specifically asked if I had been referring to former Chief Justice TAYLOR in my statement. As the *Detroit Free Press* explained:

> Outside the hearing, Kelly pledged to seek common ground with her colleagues and said her comment about the sleeping on the bench was metaphorical, not meant as an endorsement of the Democratic Party ad attacking Taylor. She said she had not seen him sleeping during the case the ad cited. [Dawson Bell, *Statewide*: *After 10 Years of the GOP, Dem to Lead High Court*, Detroit Free Press, January 9, 2009, at 3B.]

As I indicated then, I will not engage in character assassinations of my current or former colleagues.

extends to broader legal questions with wider implications, such as the doctrine of stare decisis, a particularly controversial matter.

It is no secret that the philosophical divisions among the justices on this Court are deep. For some years now, our disagreements on legal questions have erupted in occasionally heated and unpleasant personal recriminations. This case is a perfect example.[4]

I know that, if asked, both Justices YOUNG and CORRIGAN would agree with my sentiments and would deplore these outbursts. Both justices fully understand that personal recriminations reduce the public's confidence in the objectivity and wisdom of judges and in the Court as an institution.

With these reflections in mind, I urge them to reevaluate the utility of their ad hominem attacks and eliminate them. Surely each has significant confidence in the strength of their legal arguments to allow those arguments to stand on their merits, absent distracting attack props. Moreover, their personal assaults do nothing to resolve the legal issues before us; they do not benefit the parties to a case or the citizens of Michigan whom we serve.

I sincerely regret having to address these matters in the first place and would prefer that this opinion were not necessary. But I cannot stand passively by and allow

---

[4] The quotations cited by Justice YOUNG, *post* at ___ n ___, accurately point out strong language I have used in the past to criticize the former majority's *legal* reasoning in various cases. But this is far different from Justice YOUNG's criticism today, the chief purpose of which is to impugn my motives in reaching legal conclusions, thus attacking my character.

Justices YOUNG and CORRIGAN to accuse me and the justices in the "new majority" of being unprincipled and driven by inappropriate motives. Their attacks wrongly accuse Justices CAVANAGH, WEAVER, HATHAWAY, and me of reaching predetermined outcomes in many, if not all, cases rather than following the law, as we are sworn to do.

People respect the judiciary only insofar as they believe that judges decide cases impartially and without ulterior motives. Justices YOUNG's and CORRIGAN's assertion in this and previous cases that we have an "agenda" that involves selecting and overturning certain precedents is unfair and untrue. Furthermore, it undermines respect both for the justices attacked and for those making the unwarranted accusations. Most importantly, it reduces public confidence in the judiciary as a whole.

Marilyn Kelly

4

STATE OF MICHIGAN

SUPREME COURT

REGENTS OF THE UNIVERSITY OF
MICHIGAN and UNIVERSITY OF
MICHIGAN HEALTH SYSTEM,

      Plaintiffs-Appellants,

v                                No. 136905

TITAN INSURANCE COMPANY,

      Defendant-Appellee.

_____

YOUNG, J. (*dissenting*).

      Evidently, the governing standard is to be what might be called the unfettered wisdom of a majority of this Court, revealed to an obedient people on a case-by-case basis. This is not only not the government of laws that the Constitution established; it is not a government of laws at all.

                   —Antonin Scalia, in *Morrison v Olson*[1]

I agree entirely with Justice MARKMAN's dissenting opinion in this case. I write separately only to note that, today, the decade-long shrill pretense of several of my colleagues' adherence to "preserving precedent" is over. The concurring opinions of Justices WEAVER and HATHAWAY make clear that there is no longer any need for them to pretend that "precedent" is anything sacred for the "new majority" of this Court.[2] That

_____

[1] 487 US 654, 712; 108 S Ct 2597; 101 L Ed 2d 569 (1988) (Scalia, J., dissenting).

[2] "New majority" is the self-description selected by Chief Justice KELLY. See text accompanying footnote 6 of this opinion.

mask has now been cast aside. After a decade of dissents in which Justices CAVANAGH, WEAVER, and KELLY played the recurrent theme that they were hawk-like adherents to stare decisis,[3] attacking the then majority—Justices TAYLOR, CORRIGAN, MARKMAN, and me—for failing to preserve cases with whose results they agreed,[4] today precedent is no

---

[3] See, e.g., *Pohutski v City of Allen Park*, 465 Mich 675, 712; 641 NW2d 219 (2002) (KELLY, J., dissenting) ("[I]f each successive Court, believing its reading is correct and past readings wrong, rejects precedent, then the law will fluctuate from year to year, rendering our jurisprudence dangerously unstable."); *People v Hawkins*, 468 Mich 488, 517-518; 668 NW2d 602 (2003) (CAVANAGH, J., dissenting) ("'We have overruled our precedents when the intervening development of the law has "removed or weakened the conceptual underpinnings from the prior decision, or where the later law has rendered the decision irreconcilable with competing legal doctrines or policies." . . . Absent those changes or compelling evidence bearing on Congress' original intent . . . our system demands that we adhere to our prior interpretations of statutes.'"), quoting *Neal v United States*, 516 US 284, 295; 116 S Ct 763; 133 L Ed 2d 709 (1996), quoting *Patterson v McLean Credit Union*, 491 US 164, 173; 109 S Ct 2363; 105 L Ed 2d 132 (1989); *Rowland v Washtenaw Co Rd Comm*, 477 Mich 197, 278; 731 NW2d 41 (2007) (CAVANAGH, J., dissenting) ("'Under the doctrine of stare decisis, principles of law deliberately examined and decided by a court of competent jurisdiction become precedent which should not be lightly departed.'"), quoting *People v Jamieson*, 436 Mich 61, 79; 461 NW2d 884 (1990); *Devillers v Auto Club Ins Ass'n*, 473 Mich 562, 622; 702 NW2d 539 (2005) (WEAVER, J., dissenting) ("Correction for correction's sake does not make sense. The case has not been made why the Court should not adhere to the doctrine of stare decisis in this case.").

[4] In addition to the vigorous responses to these charges that each justice—TAYLOR, CORRIGAN, MARKMAN, and I—gave in our respective cases, Justice MARKMAN has already explored, at great length, the general charge that the former majority was disrespectful of precedent. See *Rowland*, 477 Mich at 223-247 (MARKMAN, J., concurring). His conclusions demonstrate quite the opposite: that while we did, in fact, overrule some prior cases, those precedents had either failed to follow even more established precedents from this Court or failed to accord the appropriate and text-based meaning to the words of this state's statutes or constitution. Moreover, we specifically set forth a test explaining the explicit standards by which a case would be reviewed in determining whether overruling it would be appropriate. See *Robinson v Detroit*, 462 Mich 439; 613 NW2d 307 (2000). Notably, this test is the *only* test to garner support from a majority of this Court, even though all members of the new majority now treat it,

longer an "issue."  Nor is precedent now an issue for my newest colleague, Justice

HATHAWAY, although her campaigns for election to the Court of Appeals and this Court

featured prominently her position adamantly proclaiming an absolutist support for stare

decisis.[5]

The new majority, being a majority, is now free to do as it pleases.  And it pleases

the new majority to honor the agenda to which our new Chief Justice pledged them after

the defeat of Chief Justice TAYLOR in 2008:

> We the new majority [Chief Justice KELLY and Justices CAVANAGH,
> WEAVER, and HATHAWAY] will get the ship off the shoals and back on
> course, and we will undo a great deal of the damage that the Republican-
> dominated court has done.  Not only will we not neglect our duties, we will
> not sleep on the bench.[6]

The new majority has not been shy about acting on its agenda to "undo" the precedents of

the "Republican-dominated court."  In the 18 months of its existence, the new majority

has moved muscularly in making good on this promise.  Just in this term alone, the new

majority has overturned the following cases recently decided by this Court:

alternatively, as "one among many varying approaches" or, worse still, not existent at all.
See, e.g., *Lansing Sch Ed Ass'n v Lansing Bd of Ed*, __ Mich __; __ NW2d __ (2010).
These standards stand in sharp contrast to the actions of the new majority and, in
particular, the legal relativism espoused by the concurring opinions today.

[5] Berg, *Hathaway attacks*, Michigan Lawyers Weekly, October 27, 2008 ("'People
need to know what the law is,' Hathaway said.  'I believe in stare decisis.  Something
must be drastically wrong for the court to overrule.'"); *Lawyers' election guide: Judge
Diane Marie Hathaway*, Michigan Lawyers Weekly, October 30, 2006 (quoting Justice
HATHAWAY, then running for a position on the Court of Appeals, as saying that "[t]oo
many appellate decisions are being decided by judicial activists who are overturning
precedent").

[6] *She Said*, Detroit Free Press, December 10, 2008, p 2A.

3

1. In *People v Feezel*, 486 Mich 184; 783 NW2d 67 (2010), the new majority overruled *People v Derror*, 475 Mich 316; 715 NW2d 822 (2006).

2. In *McCormick v Carrier*, ___ Mich ___; ___ NW2d ___ (2010), the new majority overruled *Kreiner v Fischer*, 471 Mich 109; 683 NW2d 611 (2004).

In *Lansing Sch Ed Ass'n v Lansing Bd of Ed*, ___ Mich ___; ___ NW2d ___ (2010), the new majority overruled (at least) the following cases:

3. *Lee v Macomb Co Bd of Comm'rs*, 464 Mich 726; 629 NW2d 900 (2001);

4. *Crawford v Dep't of Civil Service*, 466 Mich 250; 645 NW2d 6 (2002);

5. *Nat'l Wildlife Federation v Cleveland Cliffs Iron Co*, 471 Mich 608; 684 NW2d 800 (2004);

6. *Associated Builders & Contractors v Dep't of Consumer & Indus Servs Dir*, 472 Mich 117; 693 NW2d 374 (2005);

7. *Mich Chiropractic Council v Comm'r of the Office of Fin & Ins Servs*, 475 Mich 363; 716 NW2d 561 (2006);

8. *Rohde v Ann Arbor Pub Sch*, 479 Mich 336; 737 NW2d 158 (2007);

9. *Mich Citizens for Water Conservation v Nestlé Waters North America Inc*, 479 Mich 280; 737 NW2d 447 (2007); and

10. *Manuel v Gill*, 481 Mich 637; 753 NW2d 48 (2008).

11. In *Bezeau v Palace Sports & Entertainment, Inc*, ___ Mich ___; ___ NW2d ___ (2010), the new majority expressly overruled the limited retroactive effect of *Karaczewski v Farbman Stein & Co*, 478 Mich 28; 732 NW2d 56 (2007).

12. And in this case, the new majority now overrules *Cameron v Auto Club Ins Ass'n*, 476 Mich 55; 718 NW2d 784 (2006).

And this list is separate and distinct from those cases in which the new majority has ignored or otherwise failed to follow other recently decided precedents of this Court,[7] or the case that the new majority implicitly overruled by enacting a contradictory court rule.[8]  Several justices have even gone so far as to call into question the continued validity of precedents that are in no relevant way before the Court.[9]  Indeed, by expressly

[7] See, e.g., *Hardacre v Saginaw Vascular Servs*, 483 Mich 918 (2009), in which the majority failed to follow *Boodt v Borgess Med Ctr*, 481 Mich 558; 751 NW2d 44 (2008); *Sazima v Shepherd Bar & Restaurant*, 483 Mich 924 (2009), in which it failed to follow *Chrysler v Blue Arrow Transp Lines*, 295 Mich 606; 295 NW 331 (1940), and *Camburn v Northwest Sch Dist (After Remand)*, 459 Mich 471; 592 NW2d 46 (1999); *Vanslembrouck v Halperin*, 483 Mich 965 (2009), in which it failed to follow *Vega v Lakeland Hosps*, 479 Mich 243, 244-245; 736 NW2d 561 (2007); *Juarez v Holbrook*, 483 Mich 970 (2009), in which it failed to follow *Smith v Khouri*, 481 Mich 519; 751 NW2d 472 (2008); *Beasley v Michigan*, 483 Mich 1025 (2009), *Chambers v Wayne Co Airport Auth*, 483 Mich 1081 (2009), and *Ward v Mich State Univ*, 485 Mich 917 (2009), in which it failed to follow *Rowland*; *Scott v State Farm Mut Auto Ins Co*, 483 Mich 1032 (2009), in which it failed to follow *Thornton v Allstate Ins Co*, 425 Mich 643; 391 NW2d 320 (1986), and *Putkamer v Transamerica Ins Corp of Am*erica, 454 Mich 626; 563 NW2d 683 (1997); *Potter v McLeary*, 484 Mich 397; 774 NW2d 1 (2009), in which it failed to follow *Roberts v Mecosta Co Gen Hosp (After Remand)*, 470 Mich 679; 684 NW2d 711 (2004).

From this term, see also *Esselman v Garden City Hosp*, 486 Mich 892 (2010), in which it again failed to follow *Roberts*, 470 Mich 679.

[8]  The new majority recently amended MCR 2.112 and MCR 2.118, and the amendment effectively overruled this Court's precedent in *Kirkaldy v Rim, 478 Mich 581; 734 NW2d 201 (2007)*.  485 Mich ___, ___ (order entered February 16, 2010) (dissenting statements of CORRIGAN, YOUNG, and MARKMAN, JJ.).

[9] See *O'Neal v St John Hosp & Med Ctr*, ___ Mich ___; ___ NW2d ___ (2010) (opinion by HATHAWAY, J., joined by WEAVER, J.) (calling into question the continued validity of *Wickens v Oakwood  Healthcare Sys*, 465 Mich 53; 631 NW2d 686 (2001), regarding the doctrine of lost opportunity to survive, even though *O'Neal* in no way involved a claim for lost opportunity to survive).

overruling cases this term when, last term, it simply ignored or implicitly overruled them, the new majority has become *more aggressive* in achieving its policy agenda.

It is a touch more than ironic that Justices WEAVER and HATHAWAY now argue that well-established principles of stare decisis must give way to a justice's *subjective* view of a case. This process produces a result whereby the parties and the public will never know what criteria or standards several justices on this Court will employ until *after* the decision has been made. This ad hoc, subjective process is the very antithesis of the "rule of law" and instead denotes a system hijacked by the concurring justices, who appear to be guided and constrained only by their personal beliefs. That stare decisis is a "principle of policy," as Justice HATHAWAY repeats many times, does *not* mean that analysis of a case pursuant to the doctrine should be driven by each judge's *personal policy choices*.[10] Nor does the fact that stare decisis is a "principle of policy" mean that judges need not announce a fixed set of principles that will guide their decisions.[11] Yet

---

[10] In particular, Justice HATHAWAY apparently fails to understand that stare decisis, even as a principle of judicial policy, does not equate with a judge making individual "policy determination[s]," *ante* at ___, as if she were a citizen-legislator. As any student of the law can explain, her theory represents the precise *opposite* principle that governs courts in a society based on the rule of law. Judges serve an important yet *limited* role in a constitutional republic. Not being of the policy-making branches of government, they should never base their decisions on their own subjective policy beliefs. If nothing else, Justice HATHAWAY's admission that she is making her own personal "policy determination[s]" in cases at least provides a view into what has driven many of the decisions produced by the new majority.

[11] My criticism of Justice WEAVER's approach is not, as she alleges, that she has subscribed to a theory of stare decisis as an "inexorable command" that she now rejects. In fact, it is precisely the opposite: *She often subscribes to no objective test whatsoever.* Cases from time to time may need to be overruled, but the ultimate problem with Justice

this is precisely what characterizes Justices WEAVER and HATHAWAY's unique brand of feckless jurisprudence announced today.

The rule of law, by definition, requires judges to decide cases on the basis of principles, announced in advance, rather than on a personal or subjective preference for or against a party before them. This ensures stability in the law despite the diversity of judges' personal beliefs. Whether we, as judges, "like" the outcome is, quite simply, *irrelevant* to whether it reflects a correct conclusion of law. It is harrowing that Justices

---

WEAVER's approach is that she relies on her *subjective* application of "judicial restraint, common sense, and sense of fairness—justice for all," rather than any defined legal standard in making these decisions. And unlike her prior protests that "[c]orrection for correction's sake does not make sense," *Devillers*, 473 Mich at 622, Justice WEAVER is now working to "correct" and overrule as many recent precedents as possible. Worse still, she is content to do so without any serious stare decisis analysis as long as doing so does not offend her subjective "sense of fairness." And, as the public is no doubt aware, "common sense" is not so common and Justice WEAVER has no greater fund of common sense than anyone else. If for no other reason, that is why simply "following the law" is the best course for any serious jurist committed to the "rule of law" rather than the "rule of judges."

Justice WEAVER also selectively quotes without context a passage from an extended law review article that I authored. See Robert P. Young, Jr., *A judicial traditionalist confronts the common law*, 8 Texas Rev L & Pol 299 (2004). The article was designed to highlight, in an arresting way, how difficult it should be for any judge committed to the rule of law to make the difficult policy choices necessary when modifying the common law. Quite simply, policy-making in the judiciary is one of least desirable and most difficult things for judges to do. This is because it is hard to assess the trade-offs that competing policies might create, especially when, unlike the Legislature, judges cannot consider the competing policy positions of interest groups affected by the issue in question. However, since Justice WEAVER is not committed to the rule of law, but instead applies her brand of "common sense," she has no qualms with judicial policy-making in any context—common law or otherwise. This fact is attested to by her concurrence here and illustrated in recent decisions handed down by the new majority that she has signed.

WEAVER and HATHAWAY either do not understand this concept or refuse to subscribe to it, preferring to base their decisions on subjective "policy consideration[s]."

Finally, Chief Justice KELLY has tried on several occasions to explain away what she meant when she said the "new majority" would "undo . . . the damage [of] the Republican-dominated court," as she again attempts today. Chief Justice KELLY finds it disquieting that I quote her remarks about the "new majority's" agenda. She should. Her remarks *are* as disquieting as they are scurrilous. What is noteworthy is that Chief Justice KELLY has never repudiated what she said, apologized for it, or sufficiently explained why that statement doesn't mean what it plainly says. Instead, she merely prefers that I not repeat it for reasons that are obvious to all. Rare is it that a judge publicly tells the public that she has an agenda and what it is. I am glad that the Chief Justice was so candid because everyone can examine her conduct in light of her statement. Her motivations for making this dreadful remark and whether her subsequent resolution of cases is consistent with her remark are questions for the public to decide.

Moreover, after being the target of much *un*civil criticism by then Justice KELLY over the years, I am nonplussed by the Chief Justice's pique at the passion of my dissent and the tone in which I have expressed it. One need only review the Chief Justice's dissenting opinions over the years to acknowledge that her views on civility have conveniently changed as quickly as the new majority's view regarding the importance of

8

preserving precedent.[12]  Now that she is part of this Court's philosophical majority, her criticism of my impassioned tone recalls a line from Shakespeare: "The lady doth protest too much, methinks."[13]

---

[12] See, e.g., *People v Smith*, 478 Mich 292, 331, 335 n 4, 339 n 13; 733 NW2d 351 (2007) (KELLY, J., dissenting) (accusing the majority of "again unnecessarily chip[ing] away at the Double Jeopardy Clause" and "mangling" double jeopardy jurisprudence and noting that "in its zeal, [the majority] will at times punish a defendant twice for the same offense."); *Rowland*, 477 Mich at 256-257 & n 13, 266 (KELLY, J., concurring in part and dissenting in part) ("The majority has ordained itself master of such 'higher law' [i.e., law '"manufactured for each special occasion out of our own private feelings and opinions"'].  In doing so, it undermines the stability of Michigan's courts and damages the integrity of the judicial process."; among other charges, Justice KELLY also alleged that the majority had launched an "unprecedented attack on stare decisis," was "overturning precedent will-nilly," and "disrespect[ed] . . . past justices of the Michigan Supreme Court.") (citation omitted); *Rory v Continental Ins Co*, 473 Mich 457, 492; 703 NW2d 23 (2005) (KELLY, J., dissenting) ("The majority's decision constitutes a serious regression in Michigan law, and it gives new meaning to the term 'judicial activism.' . . . [T]he majority [reaches an unnecessary issue], apparently using this dispute as a vehicle to reshape the law on adhesion contracts more closely to its own desires."); *People v Davis*, 472 Mich 156, 190; 695 NW2d 45 (2005) (KELLY, J., dissenting) ("[The majority] destabilizes our state's jurisprudence.  It suggests to the public that the law is at the whim of whoever is sitting on the Supreme Court bench.  Surely, it erodes the public's confidence in our judicial system."); *Terrien v Zwit*, 467 Mich 56, 92; 648 NW2d 602 (2002) (KELLY, J., dissenting) (characterizing the majority opinion as "the embodiment of judge-made law" because, to Justice KELLY, it "engrafts its own version of what the law should be" and "discard[s] the knowledge and wisdom of those who came before the current Court"); *Sington v Chrysler Corp*, 467 Mich 144, 179 n 8, 180, 184; 648 NW2d 624 (2002) (KELLY, J., dissenting) (characterizing her actions as "a matter of not falling prey to a zealot's conviction that what has been done in the past by others has been simply wrong . . . .  "When a Court pays no more than lip service to [stare decisis], the basic integrity of the legal system itself is shaken . . . .  So it is that, in the history of this and of the vast majority of supreme courts across the land, overrulings of precedent are infrequent.  Yet, quite the opposite is true of the present Michigan Supreme Court.  It is for that reason that, the majority's pronouncements to the contrary notwithstanding, one may wonder whether reasoned adherence to stare decisis may properly be considered a policy of this Court."); *Robinson*, 462 Mich at 491 (KELLY, J., concurring in part and dissenting in part) ("The majority's casual disregard for this Court's past opinions suggests to future courts that they do the same and creates instability in the law of this

9

Moreover, the Chief Justice's calls for civility are especially hypocritical given the very ugly reference she made to the false "sleeping judge" ads that played so prominent a role in the campaign to defeat Chief Justice TAYLOR in 2008. Given the context that this remark was made just after the defeat of Chief Justice TAYLOR in the last election, Chief Justice KELLY's final comment that "we will not sleep on the bench" was a particularly uncivil reference denigrating our distinguished former colleague.[14] Chief Justice KELLY was present during the arguments of the case in which it was falsely asserted that Chief Justice TAYLOR fell asleep, and she knew, or should have known, that the claim was false. These facts are impossible to square with her current desire to improve civility among members of the Court.

The public should be just as indignant as I am—not only regarding the hypocrisy of the new majority's radically changing views on the question of preserving precedents, but also with its equally radically subjective approach to the law. I will continue to strive to bring such issues to the public's attention. The public may judge whether the former majority or this new majority's opinions provided greater predictability in the law and were more faithful to the actual language of the statutes, or whether the legislative "work

state. The reasons proffered to overrule [the past precedents] are based solely on the majority's subjective, contrived interpretation of the statutes involved.").

[13] Shakespeare, *Hamlet*, act 3, sc 2 (Gertrude, Queen of Denmark).

[14] It is this context that makes her after-the-fact rationalization that she was merely being "metaphorical" hard to believe. The credibility of her explanation for this is a matter for the public to decide, as is the credibility of her explanation that her statement does not refer to a substantive agenda to overturn jurisprudence decided by the prior majority.

product" was disregarded for the pet policies of the several justices who formed these respective majorities. Indeed, in a constitutional republic where judges are elected, it is the obligation of the public to do just that. Otherwise, for the foreseeable future, the public can look forward to more "damage control" in the form of brash judicial activism from the new majority.

CORRIGAN, J., concurred with YOUNG, J.

S T A T E   O F   M I C H I G A N

SUPREME COURT

REGENTS OF THE UNIVERSITY OF
MICHIGAN and UNIVERSITY OF
MICHIGAN HEALTH CARE SYSTEM,

       Plaintiffs-Appellants,

v                                    No. 136905

TITAN INSURANCE COMPANY,

       Defendant-Appellee.

_____

MARKMAN, J. (*dissenting*).

I dissent from the instant decision overruling *Cameron v Auto Club Ins Ass'n*, 476 Mich 55; 718 NW2d 784 (2006), which held that the no-fault automobile insurance act's one-year-back rule, MCL 500.3145(1), is a damages-limiting provision, not a statute of limitations, and *Liptow v State Farm Mut Auto Ins Co*, 272 Mich App 544; 726 NW2d 442 (2006), which held that MCL 600.5821(4) does not preclude the application of the one-year-back rule.[1]

---

[1] On November 26, 2008, this Court denied leave to appeal in this case, although Chief Justice KELLY and Justices CAVANAGH and WEAVER would have granted leave to appeal. 482 Mich 1074 (2008). However, after the composition of this Court changed when Justice HATHAWAY replaced former Chief Justice TAYLOR on January 1, 2009, this Court granted plaintiffs' motion for reconsideration even though the motion did not raise any new legal arguments. 484 Mich 852 (2009).

MCL 500.3145(1), part of the no-fault automobile insurance act, provides, in pertinent part: "[T]he claimant may not *recover benefits* for any portion of the loss incurred more than 1 year before the date on which the action was commenced."[2] (Emphasis added.)  This is known as the one-year-back rule.  MCL 600.5821(4), part of the Revised Judicature Act (RJA), provides, in pertinent part:

> Actions brought in the name of . . . any political subdivision of the state of Michigan[3] . . . for the recovery of the cost of maintenance, care, and treatment of persons in hospitals . . . are not subject to the *statute of limitations* and may be *brought* at any time without limitation, the provisions of any statute notwithstanding.  [Emphasis added.]

---

[2] In its entirety, MCL 500.3145(1) provides:

> An action for recovery of personal protection insurance benefits payable under this chapter for accidental bodily injury may not be commenced later than 1 year after the date of the accident causing the injury unless written notice of injury as provided herein has been given to the insurer within 1 year after the accident or unless the insurer has previously made a payment of personal protection insurance benefits for the injury.  If the notice has been given or a payment has been made, the action may be commenced at any time within 1 year after the most recent allowable expense, work loss or survivor's loss has been incurred. *However, the claimant may not recover benefits for any portion of the loss incurred more than 1 year before the date on which the action was commenced.*  The notice of injury required by this subsection may be given to the insurer or any of its authorized agents by a person claiming to be entitled to benefits therefore, or by someone in his behalf.  The notice shall give the name and address of the claimant and indicate in ordinary language the name of the person injured and the time, place and nature of his injury.  [Emphasis added.]

[3] It is undisputed that the University of Michigan Health System constitutes a political subdivision of the state of Michigan for purposes of this statute.

2

In *Cameron*, this Court held that the minority/insanity tolling provision of the RJA, MCL 600.5851(1), which addresses when one may "bring [an] action,"[4] does not preclude the application of the no-fault automobile insurance act's one-year-back rule because the latter only limits the amount of benefits that can be recovered, i.e., the one-year-back rule is a damages-limiting provision rather than a statute of limitations. See also *Howard v Gen Motors Corp*, 427 Mich 358, 385-386; 399 NW2d 10 (1986) (lead opinion by BRICKLEY, J.) (explaining that the one- and two-year-back rules of the Worker's Disability Compensation Act are not statutes of limitations).[5] I continue to believe that *Cameron* was correctly decided.

---

[4] MCL 600.5851(1), in its entirety, provides:

> Except as otherwise provided in [MCL 600.5851(7) and (8)], if the person first entitled to make an entry or bring an action under this act is under 18 years of age or insane at the time the claim accrues, the person or those claiming under the person shall have 1 year after the disability is removed through death or otherwise, *to make the entry or bring the action although the period of limitations has run*. This section does not lessen the time provided for in section 5852. [Emphasis added.]

[5] As explained in *Howard* about the one- and two-year-back rules of the Worker's Disability Compensation Act:

> A statute of limitations "represents a legislative determination of that reasonable period of time that a claimant will be given in which to file an action." *Lothian v Detroit*, 414 Mich 160, 165; 324 NW2d 9 (1982).

> * * *

> Thus, relying on these very basic definitions of statutes of limitations, the one- and two-year-back rule statutes may not be so categorized. Simply stated, they are not statutes that limit the period of time in which a claimant may file an action. Rather, they concern the time

3

The one-year-back rule "limits the amount of personal protection insurance (PIP) benefits recoverable to those incurred within one year before the action was commenced." *Cameron*, 476 Mich at 58 n 1. As *Cameron* explained:

> By its unambiguous terms, MCL 600.5851(1) concerns when a minor or person suffering from insanity may "make the entry or bring the action." It does not pertain to the damages recoverable once an action has been brought. MCL 600.5851(1) then is irrelevant to the damages-limiting one-year-back provision of MCL 500.3145(1). Thus, to be clear, the minority/insanity tolling provision in MCL 600.5851(1) does not operate to toll the one-year-back rule of MCL 500.3145(1). [*Id.* at 62.]

That is, the one-year-back rule by its straightforward language serves only as a limitation on the recovery of benefits; it does not define a period within which a claimant may file a cause of action. Therefore, the one-year-back rule is not a statute of limitations, and it lies outside the scope of what is affected by the RJA's minority/insanity tolling provision.

---

> period for which compensation may be awarded once a determination of rights thereto has been made.
>
> Moreover, the one- and two-year-back rules do not serve the same purposes as do typical statutes of limitations.
>
> * * *
>
> . . . The rules do not perform the functions traditionally associated with statutes of limitations because they do not operate to cut off a claim, but merely limit the remedy obtainable. They do not disallow the action or the recovery—a petition may be filed long after an injury and benefits may be awarded in response thereto—they merely limit the award once it has been granted.
>
> Therefore, on the basis of the language of the rules, we perceive no logical reason for characterizing the one- and two-year-back rules as statutes of limitations. [*Howard*, 427 Mich at 384-387 (lead opinion by BRICKLEY, J.).]

4

The tolling provision of MCL 600.5851(1) tolls the limitation that applies to the "bring[ing of an] action"; however, it does not toll the limitation that applies to the "recover[y of] benefits," in particular the limitation set forth in MCL 500.3145(1). Accordingly, although a plaintiff may not be prohibited from "bring[ing] the action," a plaintiff is prohibited from "recover[ing] benefits for any portion of the loss incurred more than 1 year before the date on which the action was commenced." [*Id.* at 77 (MARKMAN, J., concurring).]

The majority apparently believes that it is appropriate to overrule *Cameron* because *Cameron* overruled *Geiger v Detroit Auto Inter-Ins Exch*, 114 Mich App 283; 318 NW2d 833 (1982).[6] First, *Geiger* was a Court of Appeals decision, and thus not binding upon this Court.[7] *Catalina Mktg Sales Corp v Dep't of Treasury*, 470 Mich 13, 23; 678 NW2d 619 (2004). Second, as *Cameron* itself explained:

---

[6] Justice WEAVER would also overrule *Cameron* because it is inconsistent with "the reasons in [her] dissent to the *Cameron* decision." In her dissent, she concluded that the one-year-back rule applies when the plaintiff is able to bring an action beyond one year from the date of the accident because he provided notice or was previously paid benefits, but does not apply when notice was not provided and benefits were not previously paid. However, as *Cameron* itself explained, 476 Mich at 69-72, such a conclusion is inconsistent with the clear language of MCL 500.3145(1), which contains three pertinent provisions. The first provides that if notice was not provided and benefits were not previously paid, the action must be filed within one year after the accident. The second provides that if notice was provided or benefits were previously paid, the action must be filed within one year after the most recent allowable loss was incurred. And the third, known as the one-year-back rule, provides that losses incurred more than one year before an action was filed cannot be recovered. There is no indication whatsoever in the statute that the Legislature intended that the third provision only apply where notice has been provided or benefits have been previously paid.

[7] Moreover, contrary to the majority's suggestions, *Cameron* is not at all inconsistent with *Lambert v Calhoun*, 394 Mich 179, 181; 229 NW2d 332 (1975), which held that the minority/insanity tolling provision of the RJA "extends the time for bringing suit under an act which contains its own statute of limitations"; with *Rawlins v Aetna Cas & Surety Co*, 92 Mich App 268; 284 NW2d 782 (1979), which held that the minority/insanity tolling provision of the RJA applies to the period of limitations

5

In reaching this conclusion the Court of Appeals [in *Geiger*], looking behind the language of the statute and focusing on its understanding of the Legislature's purported intent, determined that the legislative purpose behind the minority/insanity tolling provision for periods of limitations was to preserve not only a person's cause of action during the period of disability but also the person's damage claims. It opined that to not read the statute in this fashion would "severely limit the utility" of the minority/insanity tolling provision. The Court then concluded that, "[i]n order to advance the policy of RJA § 5851," the minority/insanity tolling provision applies to prevent the capping of damages under the one-year-back rule of MCL 500.3145(1).

We believe this ruling was erroneous for the most uncomplicated reason; namely, that we must assume that the thing the Legislature wants is best understood by reading what it said. Because what was said in MCL 500.3145(1) and MCL 600.5851(1) is clear, no less clear is the policy. Damages are only allowed for one year back from the date the lawsuit is filed. We are enforcing the statutes as written. While some may question the wisdom of the Legislature's capping damages in this fashion, it is unquestionably a power that the Legislature has under our Constitution. Thus, because *Geiger*'s conclusion that the minority/insanity tolling provision applies to extend the one-year-back rule is contrary to what the Legislature clearly directed in MCL 500.3145(1) and MCL 600.5851(1), *Geiger* is overruled. [*Cameron*, 476 Mich at 63-64.]

---

contained in the no-fault automobile insurance act; with *Kleinschrodt v Gen Motors Corp*, 402 Mich 381; 263 NW2d 246 (1978), which held that the one-year-back rule of the Worker's Disability Compensation Act is a defense that can be waived; or with *Welton v Carriers Ins Co*, 421 Mich 571; 365 NW2d 170 (1984), which held that the one-year-back rule of the no-fault act is not tolled by submitting a general notice of injury to the insurer that does include a claim for specific benefits. Indeed, no case other than *Geiger* has held that the minority/insanity tolling provision of the RJA applies to the one-year-back rule of the no-fault act. Although the lead opinion characterizes *Welton* as holding "that the one-year-back rule does not apply to claims preserved by an applicable tolling or saving provision," and accuses *Cameron* of "implicitly overrul[ing] *Welton*," *Welton* held no such thing. *Welton*'s statement that "[a]pplying the tolling to both the limitation period and the period of recovery accords with common sense" is clearly dictum because *Welton* held that tolling did *not* apply in that case. *Welton*, 421 Mich at 577 n 2. Further, *Welton* involved judicial tolling, not the statutory minority/insanity tolling provision that was at issue in *Cameron*.

6

The majority here commits the same error that *Geiger* committed. That is, the majority believes that it can somehow discern the purpose of the statute from something other than its actual language, despite the fact that this Court has repeatedly held that this constitutes an improper approach to statutory interpretation. As I explained in my concurring opinion in *Cameron*:

> In *Geiger v Detroit Automobile Inter-Ins Exch*, 114 Mich App 283; 318 NW2d 833 (1982), the Court of Appeals held that the minority/insanity tolling provision does toll the one-year-back rule of the no-fault automobile insurance act. However, the only reason it gave for reaching such a conclusion is that "[a] contrary rule would severely limit the utility of the minority saving provision . . . ." *Id.* at 291. I do not necessarily disagree with *Geiger* that not tolling the one-year-back rule may well "limit the utility" of the tolling provision, perhaps even "severely," but that is often what happens when there are statutes that are in tension with one another. It can be argued just as easily that to do the opposite, to toll the one-year-back rule, would be to "severely limit the utility" of the one-year-back rule. Indeed, it can be argued that to toll the one-year-back rule is not merely to "severely limit its utility," but to do it even greater damage by vitiating its language altogether.[8] In the end, the *Geiger* rationale is not even a legal rationale at all; rather, it is little more than a statement by the majority in *Geiger* that it preferred a different statute than the one actually enacted by the Legislature. [*Id.* at 83-84 (MARKMAN, J., concurring).]

The majority criticizes *Cameron* on the basis that "[t]he only authority cited for [its] interpretation was in Justice MARKMAN's concurring opinion, which relied on dicta from Justice BRICKLEY's lead opinion in *Howard v Gen Motors Corp.*" This statement very much illustrates the flaw in the majority's approach to statutory construction-- it fails to

---

[8] It is ironic that the majority accuses the *Cameron* majority of "read[ing] the statutory language in isolation," when it is the majority here that reads the minority/insanity tolling provision in a manner so far isolated from the one-year-back rule of the no-fault act that it gives the latter *no meaning whatsoever*.

7

recognize that the best indicator of the Legislature's intent is the language of the statute itself. That is, the best "authority" cited in either the majority or concurring opinions in *Cameron* for their interpretation is the actual language of the statutes at issue. That the majority fails to apprehend this first principle of statutory interpretation sufficiently speaks to the shortcomings in its analysis.

Finally, with regard to the majority's apparent belief that it is somehow appropriate to overrule *Cameron* because *Cameron* overruled *Geiger,* even if *Geiger* was controlling precedent-- which it is not-- the majority errs by conflating all precedents as deserving of equal respect. However, as I explained in my concurring opinion in *Rowland v Washtenaw Co Rd Comm*, 477 Mich 197, 226; 731 NW2d 41 (2007), "not all precedents are built alike . . . ." Indeed, "some are better reasoned than others, . . . some are grounded in the exercise of discretionary judgments and others in the interpretation of plain language, [and] some are thorough in their analyses and others superficial." *Id.* As discussed earlier, while *Cameron* entailed a serious effort to interpret the language of the law and to render our case-law consistent with this language, *Geiger*, as also explained earlier, was principally grounded in a desire to advance the policy of the minority/insanity tolling provision over the policy of the one-year-back rule of the no-fault act. For these reasons, *Cameron*'s overruling of *Geiger* can hardly be equated with the majority's overruling of *Cameron*. The former entailed an effort to render the caselaw of our state *more consistent* with the intentions of the Legislature, while the latter renders it *less consistent*. The majority has never quite grasped that the issue of stare decisis is one that cannot be viewed exclusively in quantitative terms, but must also be

8

viewed in qualitative terms. By indiscriminately placing on equal footing all decisions of this Court that overrule precedent, without considering whether each does so in order to further the intentions of the lawmaker or to further the intentions of the judge, the majority communicates well the flaws in its understandings of stare decisis and of the judicial role itself.

In *Liptow*, the Court of Appeals, relying on this Court's decision in *Cameron*, held that MCL 600.5821(4) does not preclude the application of the one-year-back rule because MCL 600.5821(4) only exempts the state and its political subdivisions from a statute of limitations and the one-year-back rule is a damages-limiting provision, not a statute of limitations. This Court denied leave to appeal in *Liptow*, 478 Mich 853 (2007), and I agree with the Court of Appeals' decision. As the Court of Appeals explained in *Liptow*:

> MCL 600.5821(4) provides that actions brought by the state or its subdivisions to recover the cost of maintenance, care, and treatment of persons in state institutions "are not subject to the statute of limitations and may be brought at any time without limitation, the provisions of any statute notwithstanding." We conclude that, by the plain import of this language, the Legislature intended to exempt the state from statutes of limitations when bringing an action to recover public funds. The language refers to statutes of limitations and provides that an action may be brought at any time. But the statute does not address damage limitation provisions or any other limiting provisions. In other words, like the minority tolling provision, MCL 600.5821(4) concerns the *time* during which the state may bring an action; it "does not pertain to the damages recoverable once an action has been brought." *Cameron*, *supra*, 476 Mich at 62. Accordingly, we conclude that MCL 600.5821(4), like the minority tolling provision of MCL 600.5851(1), does not operate to toll the one-year-back rule of MCL 500.3145(1). *Cameron*, *supra*, 476 Mich at 61-62. [*Liptow*, 272 Mich App at 555-556 (emphasis in the original).]

9

While the RJA, specifically MCL 600.5821(4), states that an action by the state or one of its political subdivisions "may be *brought* at any time without limitation," the no-fault act, specifically MCL 500.3145(1), states that the claimant "may not *recover* benefits for any portion of the loss incurred more than 1 year before the date on which the action was commenced." (Emphasis added.) Having the right to *bring* a cause of action is not the equivalent of having the right to *recover* an unlimited amount of damages.[9] Therefore, when these two provisions are read together, it is clear that while a political subdivision may *bring* an action at any time, it cannot *recover* benefits for any portion of the loss incurred more than 1 year before the date on which the action was commenced. In other words, MCL 600.5821(4), which pertains only to *when* an action may be commenced, does not preclude the application of the one-year-back rule, which only limits *how much* can be recovered after the action has been commenced.

The majority overrules *Liptow* simply because it relied on *Cameron*. Because I believe that *Cameron* was correctly decided and that *Liptow* appropriately relied on *Cameron*, I would not overrule either *Cameron* or *Liptow*. As is obvious from the flood of opinions that the majority has recently overruled, the majority justices' repeated self-proclamations of adherence to stare decisis were merely a reflection of the fact that they agreed with the particular decisions that were being overruled. For a more thorough discussion of the majority justices' past expressions of fealty toward stare decisis, see my

---

[9] Indeed, the one-year-back rule may be more analogous to a cap on damages than it is to a statute of limitations.

10

dissent in *McCormick v Carrier*, __ Mich __, __; __ NW2d __ (2010). However, the lead opinion's reliance on Chief Justice KELLY's opinion in *Petersen v Magna Corp,* 484 Mich 300; 773 NW2d 564 (2009), which only Justice CAVANAGH joined, rather than the majority opinion in *Robinson v Detroit*, 462 Mich 439; 613 NW2d 307 (2000), should not go unnoticed. For a thorough discussion of Chief Justice KELLY's *Petersen* standard for overruling precedent, see my dissent in *Petersen*, 484 Mich at 350.[10]

---

[10] Justice HATHAWAY contends that stare decisis constitutes a "policy consideration" and that the "particular analytical approach will differ from case to case." Similarly, Justice WEAVER contends that stare decisis constitutes a "principle of policy" and that there is no need for a "standardized test for stare decisis," as long as justices exercise "judicial restraint, common sense, and a sense of fairness." The problem with these "approaches" is that "litigants will, of course, have no notice beforehand of which ["analytical approach"] will be employed, for the justices themselves will not know this beforehand." *Petersen,* 484 Mich at 380 (MARKMAN, J., dissenting). Under the concurring justices' "analytical approaches,"

> there [would be] no consistently applied . . . process with which the judge promises beforehand to comply. He or she may promise to be "fair," and he or she may seek to be fair, but there are no rules for how this fairness is to be achieved. There is only the promise that the judge will address each [precedent] on a case-by-case basis, using whatever ["policy considerations"] he or she believes are required in that instance. And the suspicion simply cannot be avoided that these varying and indeterminate ["policy considerations"] may be largely a function of the outcome preferred by the judge and by his or her personal attitudes toward the parties and their causes. Any [pertinent "policy considerations"] will be identified only *after the fact*, and these ["policy considerations"] may or may not have been invoked in resolving yesterday's dispute, and may or may not be employed in resolving tomorrow's dispute. *Any* judge can concoct an *after-the-fact* rationale for a decision; the judicial process, however, is predicated upon *before-the-fact* rationales. An ad hoc process is not a judicial process at all. In the place of predetermined rules . . . [the concurring justices] would substitute ["policy considerations"] to be determined later. [*Id.* at 381-382.]

11

What also cannot go without comment is the lead opinion's conclusion that "upholding *Cameron* is likely to result in serious detriment prejudicial to public interests" and, thus, that "this [*Petersen*] factor weighs heavily in favor of abrogating *Cameron*." Given that the lead justices believe that it is appropriate to consider their own conceptions of "public interests," their relative silence is telling with regard to the "public interest" in the viability of our state's no-fault system. It has been repeatedly recognized that because of the mandatory nature of no-fault insurance, the Legislature intended that it be affordable.[11] The lead opinion gives little heed to the fact that its decision will once

---

Although Justice WEAVER is correct that "[t]here are many factors to consider in deciding whether or not to overrule precedent," and Justice HATHAWAY is equally correct that the application of stare decisis must take place on a "case-by-case basis," this does not obviate the need to at least reasonably *attempt* to apprise the parties, and the citizens of this state, *before the fact* what these factors might be, as this Court did in *Robinson* and as the Chief Justice and Justice CAVANAGH did in *Petersen*. And whatever else can be understood of Justice HATHAWAY's and Justice WEAVER's "approaches" to stare decisis, the application of these "approaches" has resulted in 13 precedents of this Court being overruled during this term alone and 6 other precedents being teed up for possible overruling during the next term, doubtless a record pace for dismantling the caselaw of this state.

[11] See, e.g., *Tebo v Havlik*, 418 Mich 350, 366; 343 NW2d 181 (1984) (opinion by BRICKLEY, J.) (recognizing that a primary goal of the no-fault act is to "provid[e] an equitable and prompt method of redressing injuries in a way which made the mandatory insurance coverage affordable to all motorists"); *Celina Mut Ins Co v Lake States Ins Co*, 452 Mich 84, 89; 549 NW2d 834 (1996) (holding that "the no-fault insurance system . . . is designed to provide victims with assured, adequate, and prompt reparations at the lowest cost to both the individuals and the no-fault system"); *O'Donnell v State Farm Mut Auto Ins Co*, 404 Mich 524, 547; 273 NW2d 829 (1979) (recognizing that the Legislature has provided for setoffs in the no-fault act and stating that "[b]ecause the first-party insurance proposed by the act was to be compulsory, it was important that the premiums to be charged by the insurance companies be maintained as low as possible[;] [o]therwise, the poor and the disadvantaged people of the state might not be able to obtain the necessary insurance").

again raise the premiums of all insured drivers in this state.[12]

The majority also asserts that because "MCL 600.5821(4) lists the costs [for which recovery may be sought] as those for the 'maintenance, care, and treatment of persons in hospitals, homes, schools, and other state institutions,'" it "supersedes all limitations in MCL 500.3145(1), including the one-year-back rule's limitation on the period of recovery." In other words, the majority contends that MCL 600.5821(4) provides an absolute right to recover the enumerated costs. The problem with this argument, however, is that the statute says no such thing. The statute does not say that there is an unfettered right to recover the enumerated costs. Instead, MCL 600.5821(4) says only that "[a]ctions brought . . . for the recovery of the [enumerated] cost[s] . . . are not subject to the statute of limitations and may be brought at any time without limitation, the provisions of any statute notwithstanding." That is, the reference to "the recovery of the cost[s]" is in the context of describing what types of actions are *not* subject to the statute of limitations-- those "[a]ctions brought . . . for the recovery of the [enumerated] cost[s] . . . ." Nowhere within the statute is there any indication that the Legislature intended to preclude *any* and *all* limitations on the amounts of money the state and its

---

[12] Indeed, defendant Titan Insurance Company argued that overruling *Cameron* would have "devastating affects" on the orderly adjustment of no-fault claims and "threaten the viability" of the Michigan Assigned Claims Facility and the Michigan Catastrophic Claims Association because nullifying the one-year back rule will lead to a flood of decades-old no-fault claims seeking expensive family attendant care benefits. For a more thorough discussion of the stakes of undoing the compromise embodied in the no-fault act, see my dissent in *McCormick*, __ Mich at __. See also *United States Fidelity Ins & Guaranty Co v Mich Catastrophic Claims Ass'n*, 484 Mich 1; 773 NW2d 243 (2009) (YOUNG, J., dissenting).

13

political subdivisions can recover. Instead, because MCL 600.5821(4) only pertains to *when* an action may be *brought,* it "is irrelevant to the damages-limiting one-year-back provision of MCL 500.3145(1)." *Cameron,* 476 Mich at 62.

Plaintiffs also argue that *Liptow* was inconsistent with *Univ of Mich Regents v State Farm Mut Ins Co*, 250 Mich App 719; 650 NW2d 129 (2002), in which the Court of Appeals held that MCL 600.5821(4) in the RJA, exempts the state and its political subdivisions from the no-fault act's statute of limitations in MCL 500.3145(1). Specifically, the Court held:

> The language of the statute clearly indicates that the Legislature intended to exempt the state and its political subdivisions from all *statutes of limitation*. Thus, [MCL 600.5821(4)] exempts plaintiff from the *statute of limitations* contained in [MCL 500.3145(1)]. [*Id.* at 733 (emphasis added).]

However, as the Court of Appeals explained in *Univ of Mich Regents v Auto Club Ins Ass'n*, unpublished opinion per curiam of the Court of Appeals, issued March 12, 2009 (Docket No. 281917):

> [T]he decision in *Univ of Michigan Regents* concerned "statutes of limitation," not "the damages-limiting portion of MCL 500.3145(1), the one-year back rule." Consequently, there is no conflict between *Univ of Michigan Regents* and *Liptow*.[13]

As this Court has explained, "MCL 500.3145(1) contains two limitations on the time for commencing an action and one limitation on the period for which benefits may be recovered[.]" *Cameron*, 476 Mich at 61, citing *Devillers v Auto Club Ins Ass'n*, 473

---

[13] An application for leave to appeal in *Univ of Mich Regents v Auto Club Ins Ass'n* is currently being held in abeyance pending the decision in this case. *Univ of Mich Regents v Auto Club Ins Ass'n*, 774 NW2d 906 (Mich, 2009).

Mich 562, 574; 702 NW2d 539 (2005). First, "an action for PIP benefits must be commenced within a year of the accident unless the insured gives written notice of injury or previously received PIP benefits from the insurer." *Cameron*, 476 Mich at 61. Second, "[i]f notice was given or payment was made, the action can be commenced within one year of the most recent loss." *Id.* Third, under the one-year-back rule, "[r]ecovery . . . is limited to losses incurred during the year before the filing of the action." *Id. Univ of Mich Regents v State Farm* concerned the statute of limitations portion of MCL 500.3145(1), not the one-year-back rule. Therefore, there is utterly no inconsistency between *Univ of Mich Regents v State Farm* and *Liptow*.[14]

The Court of Appeals dissent stated, "I believe that the holding in *Liptow* takes an irrationally and improperly narrow view of this statute by holding that it exempts entities like plaintiff[s] from a one-year limitation on *bringing* an action but not from a one-year limitation on *recovering* in such an action." *Univ of Mich Regents v Titan Ins Co*, unpublished opinion per curiam of the Court of Appeals, issued June 5, 2008 (Docket No. 276710) (DAVIS, P.J., dissenting) (emphasis in the original).[15] *Cameron* involved a very

---

[14] This conclusion is further supported by the fact that Judges FITZGERALD and MARKEY were in the majority on *both* Court of Appeals panels.

[15] The lead opinion here likewise contends that *Cameron* and *Liptow* "created an indefensible paradox" by limiting a plaintiff to the "hollow right" of being able to bring a cause of action without being able to recover *any* damages. It also states that "*Cameron's* interpretation of the saving provision actually operates to extinguish a claim, not save it." However, the lead opinion ignores that a plaintiff will only be unable to recover damages if that plaintiff has not suffered *any* losses within the year preceding the filing of the action. Contrary to the lead opinion's contention, this does not make *Cameron* and *Liptow* "unworkable." It just means that they work differently than the lead justices

15

similar situation. In my concurring opinion in *Cameron*, I indicated that I was concerned because

> although the tolling provision instructs minors and insane persons that they are entitled to wait until one year after their legal disabilities have been removed to bring their civil actions, if they do wait, they will only be allowed to recover what may be a portion of the total damages incurred. [*Cameron*, 476 Mich at 73 (MARKMAN, J., concurring).]

However, I concluded that, regardless of my concerns about the wisdom (or lack thereof) of the statute, a judge is bound to follow this language. The same remains true here. Although to some it may seem less than optimal to exempt entities such as plaintiffs from a one-year limitation on *bringing* an action, but not also from a one-year limitation on *recovery* in that an action, that is clearly what the Legislature has done, and it is entitled to act in a way that is viewed with disapproval by members of the judiciary.

Nor is this, assuming arguendo that such is a relevant consideration, an "absurd result." Even to the extent that an "absurd result" doctrine exists in Michigan,[16] a result

---

would like them to work. Furthermore, it is not *Cameron* or "*Cameron's* interpretation of the saving provision" that prohibits a plaintiff from recovering losses incurred more than one year before the action was filed; it is the Legislature's adoption of the one-year-back rule in the no-fault act. The lead opinion also states that *Cameron* and *Liptow* are "unworkable" because they deny plaintiffs "the legal recourse the Legislature provided [them], which is . . . to recover the damages [they] incurred more than a year earlier." The problem with this assertion is that the Legislature has provided no such right. Instead, the Legislature has only provided certain people and entities the right to bring a cause of action after the period of limitations has expired. Nowhere, however, has the Legislature provided these same people and entities the right to recover an unlimited amount of money in those actions.

[16] Whether the "absurd result" doctrine should exist in Michigan is a matter of some debate, but the Court need not address the question in this case because, as discussed, what was done here by the Legislature was not absurd. It suffices to note,

16

is only "absurd" if it is "'quite impossible that [the Legislature] could have intended the result . . . .'" *Id.* at 85 n 9 (MARKMAN, J., concurring), quoting *Public Citizen v United States Dep't of Justice*, 491 US 440, 470-471; 109 S Ct 2558; 105 L Ed 2d 377 (1989) (Kennedy, J., concurring). It is entirely possible that the Legislature could have intended the result reached in *Liptow*. For example, the Legislature "*might* have intended these results in order to make no-fault insurance more affordable." *Cameron*, 476 Mich at 80 (MARKMAN, J., concurring) (emphasis in the original), citing *Griffith v State Farm Mut Auto Ins Co*, 472 Mich 521, 539; 697 NW2d 895 (2005) (stating that this Court has always been cognizant of the potential problem of "cost containment for this mandatory coverage" when interpreting the no-fault act), citing *Shavers v Attorney General*, 402 Mich 554, 599; 267 NW2d 72 (1978) (holding that "[i]n choosing to make no-fault insurance compulsory for all motorists, the Legislature has made the registration and operation of a motor vehicle inexorably dependent on whether no-fault insurance is available at fair and equitable rates"). Conceivably, as well,

> a reasonable lawmaker *might* have intended to maintain the solvency of insurers, and to enhance their ability to undertake future planning, by protecting them from multimillion dollar lawsuits filed many years after medical expenses have been incurred, and only after relatively manageable month-to-month expenses have been allowed to develop into more extraordinary decade-to-decade expenses. [*Cameron*, 476 Mich at 81-82 (MARKMAN, J., concurring) (emphasis in the original).]

---

however, that while I still subscribe to the view that the absurd result doctrine is an appropriate tool of statutory construction, the two justices who join this dissent do not. See, e.g., *People v McIntire*, 461 Mich 147, 152-160; 599 NW2d 102 (1999); *People v McIntire*, 232 Mich App 71, 122-127; 591 NW2d 231 (1998).

That is,

> [s]uch a lawmaker *might* have sought to obligate those who have incurred medical expenses to seek reimbursement on a relatively ongoing basis, rather than allowing them to wait for many years before seeking compensation. Indeed, it is conceivable that a reasonable lawmaker *might* have wished to incentivize earlier, rather than later, causes of action in order to encourage those who have incurred medical expenses to act in a manner consistent with their own financial self-interest, and to ensure that their medical expenses were reimbursed expeditiously. [*Id.* at 82 (emphasis in the original).]

"Finally, a reasonable lawmaker *might* have concluded that practical problems pertaining to evidence and proofs in old claims required some balance between the interests of the [claimant] and those of the insurer." *Id.* (emphasis in the original).

As the majority acknowledges, "if the one-year-back rule applies to [plaintiffs'] claim, plaintiffs are entitled to no damages," because all of their losses were "incurred more than 1 year before the date on which the action was commenced," MCL 500.3145(1). Indeed, all of plaintiffs' losses were incurred in 2000, and yet plaintiffs waited until 2006 to file this cause of action. Because I believe, for the reasons set forth above, that the one-year-back rule *does* apply to plaintiffs' claim, I conclude that plaintiffs' damages are not recoverable. Therefore, I would affirm the judgment of the Court of Appeals.

CORRIGAN and YOUNG, JJ., concurred with MARKMAN, J.